WEST VIRGINIA STEEL CORPORATION, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 61263.   Filed August 15, 1960.

*Carl J. Nutter, Esq.,* and *Thomas N. Chambers, Esq.,* for the petitioner.

*Charles B. Norris, Esq.,* for the respondent.

TRAIN, *Judge:* The respondent determined deficiencies in income tax and additions to tax in the years and in the amounts as follows:

| Year | Deficiency | Addition to tax,[1] sec. 291(a) |
|---|---|---|
| 1951 | $10,798.13 | |
| 1952 | 7,528.41 | $4,020.73 |
| 1953 | 16,638.30 | |

[1] All statutory references herein are to the Internal Revenue Code of 1939, unless otherwise specified.

The issues for decision are:

(1) Whether the petitioner claimed deductions as additions to its reserve for bad debts for each of the years 1951, 1952, and 1953, in excess of the reasonable needs of its business;

(2) Whether the petitioner erroneously claimed as a deductible expense for 1951, an expenditure to replace a motor in a delivery vehicle;

(3) Whether the petitioner claimed a deduction for expenses involved in rewiring and improvement to the electrical system of its plant and the purchase of spare parts during 1952, which items should properly have been capitalized during that year;

(4) Whether the petitioner improperly claimed a deduction in the amount of $25,000 for 1953, as a contribution to an alleged profit-sharing trust; and

(5) Whether petitioner is liable for additions to tax provided for by section 291(a) for 1952, for failure to file its 1952 return within the time prescribed by law or within any extension of time prescribed by the Commissioner.

### FINDINGS OF FACT.

Petitioner is a West Virginia corporation, with its principal place of business at Charleston, West Virginia. Petitioner filed its income tax returns for the years 1951, 1952, and 1953 on an accrual basis with the district director of internal revenue, Parkersburg, West Virginia.

Petitioner's business consisted primarily of fabrication of construction steel and some warehouse steel. The products, after being fabricated, were sold to coal mines, mill owners, general contractors, individual plants, and others. Petitioner's operation consisted of work on large orders for structural steel, and individual sales ranged in size from $1,500 to $1 million, many of its sales amounting to hundreds of thousands of dollars.

Petitioner's president, J. Roy Harris, hereinafter referred to as Harris, founded the company in 1934. He and his wife owned approximately 60 per cent of the company's stock. He performed the usual duties of a company president and was a member of the

board of directors. The other directors comprising the three-man board were F. A. Prince and E. F. Jones.

During the year 1951, a truck used in delivery of petitioner's product was found to have a defective motor which was replaced with a gasoline motor. This old motor was expensive to keep operational and petitioner decided that rather than repair the old motor, it would be more economical to replace it than it would be to repair it. Replacing the motor in this truck increased the value of the truck. The cost of the new motor was disallowed as a deduction by the respondent in the amount of $3,732.50 on the basis that it was a capital expenditure, and depreciation was allowed in the amount of $311.04.

Petitioner's supplies and work in process are heavy. Its plant is covered with overhead cranes which run parallel to the length of the plant. A crane costs about $16,000 to $18,000. During 1952, petitioner experienced some difficulty with the crane motors burning out which would shut down the crane's operation for a day or two or longer until the motor was repaired. The shutdown would cause a loss of production efficiency. During 1952, petitioner purchased two motors for hoists, one motor for a crane hoist, and one type MBWH–1 motor as spare parts for cranes and hoists used in the business. Petitioner purchased these motors in order that lost time could be minimized when motors then in use on cranes or hoists required repair.

During the year 1952, petitioner found that the arrangement of machinery within the plant resulted in bottlenecks to its production and decided to rearrange equipment for more efficient operation. Before this rearrangement was undertaken, it had discovered that electrical motors were not operating efficiently, and after investigation by a superintendent of the Appalachian Electrical Power Company, it was discovered that the electrical wiring was inadequate. Voltage was very low in some parts of the shop and this inadequate wiring caused motors to burn out and, in at least one instance, resulted in a fire. A check developed that electrical wires in the plant were overloaded which necessitated taking out old wiring and having proper wire put in.

Petitioner from time to time would move a piece of machinery to work upon a specific job; however, in conjunction with the rewiring of the plant there was a general rearrangement of the layout of machinery in the plant. Some machines were moved to an area of the plant which had previously been used for storage, which necessitated extending the wiring to that area.

The rewiring expense was $9,414.61 which was deducted by petitioner. The respondent determined it to be a capital expenditure and disallowed the deduction.

On January 1, 1951, petitioner had a reserve for bad debts in the amount of $26,428.41. During the years 1949 to 1953, inclusive, petitioner had the following bad debts which were charged against the reserve in each of the years as follows:

| Year | Bad debts charged against reserve |
|---|---|
| 1949 | $2,160.91 |
| 1950 | 707.55 |
| 1951 | 3,285.86 |
| 1952 | 237.01 |
| 1953 | 700.28 |

As reflected on its 1951 return, petitioner's bad debt reserve totaled $26,428.41 at the beginning of 1951 and $34,153.93 at the end of the year, or a net increase in the reserve in 1951 of $7,725.52. Petitioner's return for 1952 reflects a gross addition to the reserve of $4,185.69. The reserve, which totaled $34,153.93 at the beginning of the year stood at $38,102.61 at the end of the year, or a net increase in the reserve in 1952 of $3,948.68. Petitioner's return for the year 1953 reflects a gross addition to the reserve of $700.28 and charges against the reserve of $700.28, resulting in no change in the reserve account during the year.

During the year 1957, petitioner charged off as bad debts six accounts totaling $26,794.91. None of these accounts was on petitioner's books during the years before the Court.

Petitioner's business during the tax years was primarily with private contractors and concerns, rather than with the Government as had been the case previously.

The respondent disallowed all additions to the bad debt reserves in each of the years 1951, 1952, and 1953.

During the year 1953, petitioner requested and was granted a 60-day extension for filing its 1952 income tax return. The extension in question was granted by a letter, dated March 11, 1953, from the district director, Parkersburg, West Virginia, which stated in part as follows:

Your recent request for an extension of time within which to file your Corporation income and Excess Profits Tax Return, Form No. 1120, for the year 1952 has been received.

In view of the representations made, you are hereby granted an extension to May 15, 1953, within which to complete and file the return in question, provided a tentative return or Form 7004, Statement in Lieu of Tentative Return, is filed with this office on or before March 20, 1953, and payment made at that time of at least 40 per cent of the total estimated tax shown thereon to be due.

Pursuant to the permission granted by the above letter, the petitioner filed a tentative return for 1952 on March 16, 1953, which showed a total tax due for 1952 of $69,500. This tentative return was accom-

panied by a payment by the petitioner of $27,800, this amount being 40 per cent of the total estimated tax shown on the return to be due.

On Monday, May 11, 1953, petitioner's chief accountant delivered to the desk of the president of petitioner, the completed 1952 income tax return of petitioner. Petitioner's president was attending a convention and forgot about the return until after the date for filing had passed. The return was mailed from Charleston, West Virginia, on Monday, May 18, 1953, and received in the office of the district director at Parkersburg, West Virginia, on Tuesday, May 19, 1953. The total tax shown on the return for 1952 was $72,886.11. The amount of tax shown on the return to be due on May 15 and paid on May 18 was $1,354.44. The addition to tax determined by respondent because of the late payment is $4,020.73. The latter amount was equal to 5 per cent of the total tax liability of the petitioner for 1952 which was determined by the respondent to be $80,414.52.

A proposed profit-sharing plan for petitioner was submitted to petitioner's employees by letter dated December 23, 1953. The letter transmitting the proposed plan to the employees contained, in part, the following paragraphs:

This plan is in its tentative stage and is subject to changes and final approval of our Government. This will require several months.

The best time to start the plan is the beginning of the new fiscal year—January 1, 1954. If it is not started then it will be difficult to start before another fiscal year.

\* \* \* \* \* \* \*

In the event this Profit Sharing Plan should not be approved in the next few months, the Company agrees to refund to you in full any deduction made from your pay.

The proposed profit-sharing plan and proposed trust fund contain the following pertinent sections:

PROPOSED PROFIT SHARING PLAN

\* \* \* \* \* \* \*

F. \* \* \*

An employee is eligible for the cash bonus if he starts to work by January 2nd or first work day of year and works the balance of the year.

CASH BONUS

G. The amounts paid to the employees in cash is calculated on a unit system. A fraction or more of a unit is given to an employee, per $100.00 of straight time pay per year not to exceed 40 hrs per week.

\* \* \* \* \* \* \*

J. Employees who work in a supervisory capacity are given additional units in proportion to the responsibility they carry. These units are as follows:

Foreman _____ 15 Units
Assistant Department Head _____ 20 Units
Department Head _____ 25 Units
Executive Committee _____ 40 Units
Officer _____ 60 Units

PROPOSED TRUST FUND

\*        \*        \*        \*        \*        \*        \*

E–1  The same unit system as used in the "Cash Bonus Plan" will be used to calculate each qualified employee's share of the amount paid by the Company to the Trust Fund.

\*        \*        \*        \*        \*        \*        \*

K–1  *Resignation or Dismissal.*

If an employee resigns or is dismissed, he will always be paid the total amount he has paid into the *Trust Fund* plus any interest this amount has earned. After the employee has paid into the *Trust Fund* a period of one full year he will also share in the *Fund* credited to his account by the Company on the following basis:

| | |
|---|---|
| 1 full year of service with Company _____ | 10% |
| 2 full years of service with Company _____ | 20% |
| 3 full years of service with Company _____ | 30% |
| 4 full years of service with Company _____ | 40% |
| 5 full years of service with Company _____ | 50% |
| 6 full years of service with Company _____ | 55% |
| 7 full years of service with Company _____ | 60% |
| 8 full years of service with Company _____ | 65% |
| 9 full years of service with Company _____ | 70% |
| 10 full years of service with Company _____ | 75% |
| 11 full years of service with Company _____ | 80% |
| 12 full years of service with Company _____ | 85% |
| 13 full years of service with Company _____ | 90% |
| 14 full years of service with Company _____ | 95% |
| 15 full years of service with Company _____ | 100% |

\*        \*        \*        \*        \*        \*        \*

O–1  The trust fund shall be administered by a board of trustees. One trustee shall be elected by the board of directors of the Company and two by the employees of the Company. An employee to qualify as a trustee must have had at least ten years of service with the Company at the time of his election and participating in trust fund. The elections shall be held on the second Tuesday of March each year for a term beginning the first day of April. At the first such election one trustee will be elected to serve one year, one trustee to serve two years and one trustee to serve three years. At the first such election the Board of Directors shall elect the two year trustee and the employees shall elect the one and three year trustees. At each annual election the Board of Directors or the employees shall elect the trustee depending whether it is a Board of Director trustee or an employees' trustee whose term is expiring. In case of vacancy on the Board of Trustees the Company Board of Directors shall appoint a trustee to serve until the next election.

P–1  It is the intention of the Company to make this a permanent plan. However, the right is reserved to change the plan or to conclude it if it is not satisfactory at the completion of any year.

At a special meeting of petitioner's stockholders December 31, 1953, the following resolution was passed:

RESOLVED FURTHER: That the Board of Directors of the West Virginia Steel Corporation, be and they hereby are authorized to take such actions as are necessary to put into operation the proposed Profit Sharing Plan presented at this meeting as of January 1, 1954; \* \* \*

Petitioner turned over to Harris a check dated February 27, 1954, in the amount of $25,000 made payable to West Virginia Steel Cor-

poration Profit Sharing Trust. This check was held by Harris until April 5, 1954, at which time it was deposited to an account in the Bank of West Virginia at Charleston, West Virginia, to an account opened then in the name of West Virginia Corporation Profit Sharing Trust.

Two employee trustees were elected on the second Tuesday of March 1954. At a meeting of the board of directors on March 26, 1954, Harris was elected as the company trustee representative. The first meeting of the trustees of West Virginia Steel Corporation Profit Sharing Trust was held on April 2, 1954. On July 14, 1954, the petitioner and trustees John Ashley, John R. Hall, and Harris entered into a trust agreement to administer the funds of petitioner's profit-sharing and pension trust.

After the acceptance of the proposed plan by the employees and its ratification by the stockholders of petitioner, further action with regard to the proposed profit-sharing plan and trust agreement was taken by attorneys of petitioner to refine the plan and to prepare a trust agreement in writing. By letter dated July 20, 1954, petitioner forwarded its profit-sharing trust to the district director of internal revenue at Parkersburg, West Virginia, for a determination as to whether or not the trust was exempt from income tax under the provisions of section 165(a) and whether or not contributions made to such trust were allowable as deductions from gross income in accordance with section 23(p).

By letter dated April 6, 1954, petitioner distributed to its employees a "confidential" letter containing, in part, the following:

May I congratulate you on your selection of Trustees. I'm certain you have selected two good men.

The Trustees had their first meeting last week and Mr. Hall will give you a report.

\* \* \* \* \* \* \*

I am very happy to report that the Company gave to the Trust Fund at the close of last year $25,000.00. At the close of this year's business, this amount will be added to the employees' share of this year's profit to the Trust Fund and divided on the unit basis as set up in our plan. Of course this is subject to Government approval.

By letter dated November 18, 1954, in answer to prior correspondence from petitioner, the district director of internal revenue stated as follows:

You desire a determination as to whether such trust is exempt from income tax under the provisions of Section 401(a) of the Internal Revenue Code of 1954.

The plan, as evidenced by the trust indenture and other relevant information submitted with the request for a determination, has been considered and this office is of the opinion that the plan meets the requirements of Section 401(a) of the Internal Revenue Code of 1954, and that the trust established thereunder is entitled to exemption under the provisions of that section. \* \* \*

By letter dated February 1, 1955, to the petitioner from the then acting district director, the following advice was given:

A review has been made of the profit-sharing and bonus plan submitted by you and your request as to whether the plan meets the requirements of Section 401(a) of the Internal Revenue Code of 1954 and is entitled to exemption under the provisions of that section.

\* \* \* \* \* \* \*

The provision of the plan which gives additional units to a Foreman, Assistant Department Head, Department Head, Executive Committee and Officer is discriminatory in favor of such employees and does not meet the requirements of section 401(a)(4) of the Internal Revenue Code of 1954, which provides in part that a profit-sharing plan shall constitute a qualified trust if the contributions or benefits provided do not discriminate in favor of employees who are officers, shareholders, persons whose principal duties consist in supervising the work of other employees, or highly compensated employees.

Under paragraph P-1 of the plan and paragraph 6 of the Trust the Company reserves the right to terminate the plan and trust by filing with the Trustees written notice of termination. However, in order for a profit-sharing plan to qualify under the provisions of section 401(a) of the 1954 Code, it must definitely provide for 100% vesting of the amount standing to the credit of participants in the trust fund, upon termination of the plan; it must also provide for the allocation of any unallocated funds in the trust in a manner which does not produce the prohibited discrimination. Furthermore, there can be no forfeitures because of termination of employment or for any other reason after the plan has terminated.

The plan and trust submitted does not make any provision for the yearly valuing of the trust assets and readjustment of participants accounts.

\* \* \* \* \* \* \*

In view of the above comments, the plan file, in duplicate, is returned for your further consideration and when amended, to be re-submitted to this office.

By letter dated May 11, 1955, petitioner, by its president, Harris, wrote to the United States Treasury Department, Parkersburg, West Virginia, as follows:

In accordance with instructions in your letter of February 1, 1955, we have amended our Profit Sharing Plan to meet the conditions set forth and are resubmitting our plan for approval.

Accompanying this letter of May 11, 1955, was a "Supplemental Agreement" dated April 25, 1955, to supplement the trust agreement of July 14, 1954. The second and third paragraphs of this agreement state as follows:

WHEREAS, the Company during the year 1953 did establish a profit sharing plan, and as a part of said plan did execute an agreement of trust on July 14, 1954; and

WHEREAS, it is necessary to modify said plan and agreement in order to qualify same under the Internal Revenue Code.

### OPINION.

(1) *Additions to reserve for bad debts.*—Section 23(k) of the 1939 Code allows a taxpayer a deduction for losses actually sustained by

reason of bad debts, and alternatively a deduction for "reasonable" additions to a bad debt reserve. Petitioner's officers testified that they had considered the additions to the bad debt reserve reasonable when made and, in fact, stated that they had felt some concern over the adequacy of the reserve during the years in question. In this latter connection, they testified that the credit risk entailed in petitioner's operations was increasing as its business converted from Government to private contracts. However, the facts of record with respect to the years before us lend no support to this contention.

The burden is upon petitioner to show that the additions were "reasonable." The reserve actually maintained by the petitioner was substantial and, in each of the years involved, far in excess of the actual bad debts incurred. The petitioner incurred very substantial bad debt losses in 1957, it is true, but, as we have found, the accounts with respect to which those particular losses were incurred were not on petitioner's books during the tax years. In view of the size of the reserve at the beginning of the period, we cannot say on this record that any further additions in respect of bad debts were "reasonable" during the years involved. The respondent's disallowance of the additions is sustained. *Bellefontaine Federal Savings & Loan Association,* 33 T.C. 808 (1960).

(2) *Expenditures for equipment and rewiring.*—With respect to the delivery vehicle, the petitioner completely replaced the old engine at a cost of $3,732.50. Petitioner claims that the installation of the new engine had no appreciable effect upon the value of the vehicle and did not increase its life. Upon the facts before us, we cannot agree. A replacement of this sort cannot be considered a mere matter of current maintenance as petitioner contends. It represents an addition to capital investment and the determination of the respondent in this respect must be sustained.

Similarly, the purchase of spare motors for the overhead cranes must be considered additions to capital investment. These were purchased as standby equipment in the event the existing motors broke down and needed repair or replacement. We find no reason why these expenditures should be treated any differently from that discussed above with respect to the vehicle engine, and the respondent's determination is sustained.

During the year 1952, petitioner undertook a general rearrangement of machinery throughout its plant and an area previously used for storage was converted to use for the location of machinery. At about the same time, it was discovered that the electrical wiring in the plant was not adequate for the needs of petitioner's business. The rewiring adapted petitioner's property to its business and constituted a substantial change in the electrical system of the plant. The expenditure for such electrical rewiring likewise constituted a

capital outlay and not a current expense item. The petitioner contends that such rewiring was a recurring necessity because of the changing requirements of its contract business. However, the evidence indicates that the rewiring in question represented a permanent change and improvement in production facilities. The respondent's determination is sustained.

(3) *Addition to tax for late filing.*—The failure to file petitioner's 1952 return was due to the fact that petitioner's president was absent at a business convention and simply forgot the return. The failure was not due to willful neglect. However, in order to avoid the penalty, the petitioner must also establish that the failure was due to reasonable cause.[2] It is well settled that forgetting to file tax returns does not constitute a "reasonable cause." *Rogers Hornsby,* 26 B.T.A. 591 (1932); *Calvert Iron Works, Inc.,* 26 T.C. 770 (1956); and *Beck Chemical Equipment Corporation,* 27 T.C. 840 (1957). The respondent's imposition of the addition to tax must be sustained.

The question remains of the proper amount upon which the addition to tax should be computed. The respondent asserts that under section 291(a), set forth *supra* in the margin, the addition must be computed not on the amount due but on the entire tax. The petitioner, on the other hand, argues that the addition should not exceed 5 per cent of the net amount of tax due. Section 56(b)(2)(A) required that a corporate taxpayer electing to pay its income tax for 1952 in installments pay 40 per cent of the tax in its first installment. In the instant case, as we have found, the petitioner received an extension of time until May 15, 1953, within which to complete and file its 1952 return, conditioned upon its filing a tentative return by March 20, 1953, and upon payment being made at that time of at least 40 per cent of the total estimated tax shown thereon to be due. When petitioner filed the return for which the extension had been granted (and which was the late return here in issue) it made an additional payment of $1,354.44. The return filed on May 19, 1953, showed a tax liability, as finally computed by the taxpayer, of $72,886.11, of which 40 per cent would be $29,154.44. Therefore, the $1,354.44 paid at that time was the amount necessary to bring the

---

[2] SEC. 291. FAILURE TO FILE RETURN.

(a) In case of any failure to make and file return required by this chapter, within the time prescribed by law or prescribed by the Commissioner in pursuance of law, unless it is shown that such failure is due to reasonable cause and not due to willful neglect, there shall be added to the tax: 5 per centum if the failure is for not more than thirty days with an additional 5 per centum for each additional thirty days or fraction thereof during which such failure continues, not exceeding 25 per centum in the aggregate. The amount so added to any tax shall be collected at the same time and in the same manner and as a part of the tax unless the tax has been paid before the discovery of the neglect, in which case the amount so added shall be collected in the same manner as the tax. The amount added to the tax under this section shall be in lieu of the 25 per centum addition to the tax provided in section 3612(d)(1).

total payments of the petitioner up to 40 per cent of the total tax as computed by petitioner.

Section 6651(b) of the 1954 Code provides specifically that the addition to tax for a delinquent return is to be computed on the net amount due,[3] as contended by petitioner. However, section 6651(b) is not applicable to the year involved here, and the question is controlled by section 291(a). The language of that section, set forth above, permits no alternative to the determination made by the respondent. The section does not refer to the "net amount due," nor does it provide for any credit with respect to prior payments. The addition is to be computed as a percentage of "the tax" which, in the absence of specific qualification, must be construed as meaning the entire tax.

We are aware that in a ruling [4] explaining section 6651(b) of the 1954 Code the respondent stated as follows:

Section 6651(b) is a new provision and expressly provides that for purposes of computing the delinquency penalty, the amount of the tax required to be shown on the return shall be reduced by the amount of any part of the tax which is paid on or before the date prescribed for payment of the tax and by the amount of any credit against the tax which may be claimed upon the return. *The effect of this section is to provide specific statutory authority for the existing administrative rule whereby the delinquency penalty is computed on the net amount of tax due on the return rather than on the gross amount of tax required to be shown on the return.* [Emphasis added.]

Beyond the bare assertion just quoted, we have discovered no authority in support of the existence of the alleged "administrative rule." Of course, it would seem reasonable that the respondent would not have made such a statement in a published ruling unless it was based upon fact. Moreover, if such an administrative practice did exist, it is perhaps natural to speculate as to why it was not applied in the instant case. However, such speculation does not aid us here. The respondent's determination accords with the plain language of the statute and must be sustained. If this result appears harsh under the circumstances of this case, that is presumably the very reason that led Congress to change the law in 1954.

(4) *Contribution to profit-sharing plan.*—The petitioner contends that the events of 1953, including the employees' and stockholders' actions, with respect to the proposed profit-sharing plan gave rise to an obligation of the company in 1953, properly accruable in that year since payment was made within 60 days after the close of the

---

[3] SEC. 6651. FAILURE TO FILE TAX RETURN.

(b) PENALTY IMPOSED ON NET AMOUNT DUE.—For purposes of subsection (a), the amount of tax required to be shown on the return shall be reduced by the amount of any part of the tax which is paid on or before the date prescribed for payment of the tax and by the amount of any credit against the tax which may be claimed upon the return.

[4] Rev. Rul. 54-427, 1954-2 C.B. 42, 43.

taxable year to the trust or the trustee. Section 23(p)(1)(E) of the 1939 Code provides, in part, as follows:

a taxpayer on the accrual basis shall be deemed to have made a payment on the last day of the year of accrual if the payment is on account of such taxable year and is made within sixty days after the close of the taxable year of accrual.

The respondent argues that $25,000 is not a proper accrual of 1953, that the plan as originally formalized was discriminatory, that the trust was not tax exempt until corrected in 1955, so that payment to the plan in 1953 would not qualify as a deduction under section 23(p) for that year.

The basic issue is whether the $25,000 was a proper accrual in 1953. The petitioner does not allege that payment was made in 1953, except insofar as section 23(p)(1)(E) provides that payments made within 60 days after the close of the year of accrual are treated as if they had been made during the year of accrual for tax purposes. The petitioner alleges that payment was made by the issuance of the check to the company-elected trustee in February 1954 thereby qualifying as a payment on the last day of 1953.

By the very terms of the stockholders' resolution and the terms of the trust instrument, the effective date of the trust was January 1, 1954. Petitioner does argue that, even though the effective date of the trust was January 1, 1954, the controlling date is the date in which the plan was adopted, citing *Tallman Tool & Machine Corporation*, 27 T.C. 372 (1956). In that case, as well as in *Crow-Burlingame Co.*, 15 T.C. 738 (1950), dealing with a similar problem, the effective dates of the trusts were the same as the dates in which the resolutions were adopted creating the trusts. Respondent had argued unsuccessfully in *Tallman Tool & Machine Corporation* and *Crow-Burlingame Co.*, both *supra*, that no trust could exist until moneys were in fact paid into it thereby creating the trust reserve. We held that the expressed intention of the stockholders and the board of directors controlled the existence of the trusts. In the instant case, however, petitioner's stockholders expressly stated that the effective date of the trust was to be January 1, 1954. Petitioner had incurred no liability which could properly be accrued on December 31, 1953, or which could be enforced by the employees at any time during 1953; nor did the employees' rights under the trust become fixed prior to January 1, 1954. All events must occur which fix the amount of the expense and determine the liability of the taxpayer to pay it before an expense item may accrue. *United States v. Anderson*, 269 U.S. 422 (1926).

We hold that petitioner could not accrue as an expense of 1953 the $25,000 in question. *Abingdon Potteries, Inc.*, 19 T.C. 23 (1952).

The respondent's disallowance of the deduction is sustained. In view of this decision, it is unnecessary for us to consider the alternative questions regarding the trust.

Reviewed by the Court.

*Decision will be entered under Rule 50.*

DRENNEN, *J.*, did not participate in the consideration of or decision in this report.

PIERCE, *J.*, dissenting in part: I respectfully dissent from that portion of the Court's opinion in which it has approved the imposition of a $4,000 addition to tax, for a nonwillful, over-the-weekend delay of one business day, in the filing of the petitioner's 1952 return —notwithstanding that only $1,354 of the tax was not timely paid. The harshness of such action, which I think is unwarranted by proper construction and application of section 291(a), is indicated by the fact that such penalty exceeds the amount of the addition to tax which could have been imposed for fraud, if the entire determined deficiency had been due to willful intent to evade the tax.

My dissent is based on two grounds. First: I believe that on the basis of the undisputed facts and circumstances established by the evidence, the Court should have held that the petitioner's delay in filing, was "due to reasonable cause"; and hence that no penalty should be imposed. And secondly: I believe that the Court, in holding that the addition to tax should be computed on the gross tax liability, without reduction for that portion of the tax which was timely paid, adopted a construction for section 291(a) which is: (a) Directly contrary to the construction of said statute, which the Internal Revenue Service has publicly announced to be its "existing administrative rule"; (b) directly contrary to a prior holding of this Court, as to the proper construction and application of said statute; and also (c) directly contrary to the construction which Congress has prescribed for application to the cognate provision of the 1954 Code.

1. Whether or not delay in the filing of a taxpayer's return is "due to reasonable cause and not due to willful neglect," is primarily a factual question. The following summary of the pertinent testimony of petitioner's president, Roy Harris (which was not disputed) clearly reveals the facts and circumstances which occasioned the delay.

President Harris testified that the preparation of petitioner's returns had, at all times since the corporation commenced business, been handled by R. B. Rollins Company, public accountants. During the preparation of its 1952 income and excess profits tax return,

petitioner encountered difficulty in assembling the necessary figures; and it therefore applied to the Internal Revenue Service for a 60-day extension of time for filing the return. On March 11, 1953, an extension to May 15, 1953, was granted. In conformity with the terms of such extension, petitioner timely filed a tentative return, on which it was estimated that the total tax for the year would be $69,500; and it paid, as the "1st installment" thereof, 40 per cent of such estimated tax, or $27,800.

Harris further testified that on Monday, May 11, 1953, when he was getting ready to go to Cleveland to attend a mining congress which had relation to petitioner's steel business, the chief accountant delivered to him the completed final return here involved. What then happened is disclosed by the witness' following statements:

I had put it [the return] in my personal file because I had intended to be back on Friday, the 15th and mail the return, but I was tied up while I was there, I was very busy and instead of leaving Cleveland on Thursday night or Friday morning as I had intended to, I didn't get away and I didn't get home until about midnight Saturday night, and frankly, I forgot about the income tax return until I was in my car pulling out of the City of Cleveland was the first time I thought of it.

I had been so busy, so I thought of going down Sunday, which I did do and worked awhile and I thought I would get that thing out and I had the second thought that I called Mr. Keyser [the then district director of internal revenue for West Virginia] on Monday and explained what happened.

*      *      *      *      *      *      *

I intended to mail the return, but then I had a second thought, and decided to wait and called Mr. Keyser the first thing Monday morning and I sent it over by messenger and it would get there as early as if it had been mailed on Friday.

*      *      *      *      *      *      *

I did [call Mr. Keyser on Monday, May 18].

*      *      *      *      *      *      *

I told him what happened, explained just what I have explained to the Court * * * and I told him I would send it over by messenger.

*      *      *      *      *      *      *

Mr. Keyser told me that it wouldn't be necessary, just to drop it in the mail and he said, "It always takes several days to process them anyway. Would you write a letter along with it for my attention so it will be handled right?"

*      *      *      *      *      *      *

This is the letter [dated May 18, 1953] I wrote to the Director of Internal Revenue. "Attention Mr. Rob M. Keyser. In accordance with the telephone conversation * * * we are pleased to inclose herewith our final income tax return for 1952 together with check in the amount of $1354.44 covering payment in full of taxes now due. We regret this was not mailed to you on the 15th but the writer was detained at the mining congress and did not return to the office until today. The return was locked in his personal file and there was no way anyone else could get it. We are sorry it happened. Trust you will forgive us. Yours very truly," signed by West Virginia Corporation by me.

The final return thus filed reported total income and excess profits tax for the year of $72,886.11; and the amount of the first 40 per

cent installment due thereon, exceeded the installment paid on the previously filed tentative return, by the amount of $1,354.44. There is no claim or suggestion that there was any delinquency in payment of the tax shown on the final return, except as to said amount of $1,354.44. No penalty has been claimed, except for the above-mentioned delay of one business day, in the filing of the final return.

It should be observed that imposition of an addition to tax under section 291(a), for delay in filing a return, is not automatic. Rather, the statute provides expressly for the elimination of such a penalty in situations where the delay is "due to reasonable cause and not due to willful neglect." In the absence of any statutory definition of said phrase, it may reasonably be assumed that the same was intended to cover situations in which a taxpayer's conscientious intention to meet the fixed filing date is frustrated by unanticipated business or personal contingencies. And it may further be assumed that such phrase was intended to be applied reasonably, to promote its purpose. Under a system of "self-assessment" such as ours, in which the confidence and cooperation of taxpayers are indispensable, it would seem that every effort should be made to administer the statute in a fair and commonsense manner.

I believe that the Court's application of the phrase "due to reasonable cause," to the facts and circumstances here present, is unnecessarily harsh and inequitable; and that the effect of this is to establish a precedent for the application of such phrase which will defeat its intended purpose, and rob it of most of its usefulness.

2. As regards the method for computing an addition to tax under section 291(a), said section provides in material part:

there shall be added to the tax: 5 per centum if the failure is for not more than thirty days with an additional 5 per centum for each additional thirty days or fraction thereof during which such failure continues, not exceeding 25 per centum in the aggregate. * * *

This raises the question: 5 per centum of *what* is to be added to the tax? There are at least three possible interpretations. (1) The statute could mean: 5 per cent of the *net amount of the gross tax reported* on the return, after reduction for any part of the tax timely paid by the taxpayer through advance payments, or on a declaration of estimated tax, or by withholding at the source, or by credit for overpayments on returns for prior years. Or (2) in the case of a corporate return on which the tax could be paid in installments, the statute might mean: 5 per cent of the *installment of tax* payable at the time the return was due, if all subsequent installments were paid on time, and (as here) the Government made no demand for acceleration of such installments. Or (3) the statute might mean: 5 per cent of the *gross tax imposed by the statute*, including both the tax

reported on the return and any deficiency subsequently determined, without reduction for any portion of the tax timely paid, or for any credit for overpayments allowable.

In considering this problem, the following sequence of events, having relation to the method of computation, is significant.

First: When the 1954 Code was enacted, Congress included in subsection (a) of section 6651 thereof, a provision for an addition to tax for failure to file tax returns (including those for income tax and also for various other types of taxes) which is, in material respects, substantially the same as section 291(a) of the 1939 Code here involved. And then, immediately thereafter, it included subsection (b), which provides as follows:

(b) PENALTY IMPOSED ON NET AMOUNT DUE.—For purposes of subsection (a), the amount of tax required to be shown on the return shall be reduced by the amount of any part of the tax which is paid on or before the date prescribed for payment of the tax and by the amount of any credit against the tax which may be claimed upon the return.

Second: Almost immediately after said 1954 Code had become effective, the Internal Revenue Service published Rev. Rul. 54–427, 1954–2 C.B. 42, 43, in which the following statement is included:[1]

The effect of this section [6651(b)] is to provide specific statutory authority for the existing administrative rule whereby the delinquency penalty is computed on the net amount of tax due on the return rather than on the gross amount of tax required to be shown on the return. [Emphasis supplied.]

Third: On January 7, 1955, this Court decided the case of Thomas A. McGovern, T.C. Memo. 1955–1, wherein the taxpayer and his wife had been delinquent in filing income tax returns for both of the years 1949 and 1950. The Court, in approving the imposition of additions to tax for both years, under section 291(a), said:

This penalty, however, must be measured by petitioners' tax liability, less the amount of tax withheld at the source on petitioner's wages. In other words, as in the case of the delinquency penalty for 1949, credit should be allowed the petitioners for taxes withheld before applying the delinquency penalty for 1950.

In the instant case, the deficiency notice in which the penalty involved was determined, was not issued until December 8, 1955, which

---

[1] The "Introduction" to the Cumulative Bulletin above cited, states in part:

The Internal Revenue Bulletin is the authoritative instrument of the Commissioner of Internal Revenue for the announcement of official Internal Revenue rulings, and for the publication of Treasury Decisions, Executive orders, legislation, and court decisions pertaining to Internal Revenue matters.

It is the policy of the Service to publish in the Bulletin all substantive and procedural rulings of importance or general interest, the publication of which is considered necessary to promote a uniform application of the laws administered by the Service. * * * All published rulings have received the consideration and approval of the Chief Counsel.

Revenue Rulings reported in the Bulletin do not have the force and effect of Treasury Department Regulations (including Treasury Decisions), but are published to provide precedents to be used in the disposition of other cases, and may be cited and relied upon for this purpose. * * *

was subsequent to the foregoing sequence of events; and, as shown on its face, it was issued out of a regional office of the Internal Revenue Service, in the Cincinnati region. This Court, in its Opinion herein, posed the question: "[I]f such an administrative practice [such as that publicly announced in the above-cited Cumulative Bulletin] did exist, it is perhaps natural to speculate as to why it was not applied in the instant case." The most likely answer to this is: That the regional administrative officer who recommended the penalty, probably overlooked the above-mentioned pertinent announcement of the Internal Revenue Service, since it was included in a ruling that pertained primarily to the 1954 Code, rather than to the 1939 Code; that he probably also overlooked the above-cited Memorandum Opinion of this Court, which was not officially published; and that, in such circumstance, he probably followed the not uncommon practice of applying that construction to the statute, which would "protect the revenue" by yielding the largest possible exaction.

In any event, it is obvious that the construction of section 291(a) which the Court has approved in the instant case, could lead to ridiculous results. For example, the late filing of a return for a large amount of tax, of which all but $1 had been timely paid, could give rise to an addition to tax of thousands of dollars. Indeed, in numerous cases, the bulk of the tax is satisfied by payments made on declarations of estimated tax, or by withholdings on salaries or wages, or by other prepayments and credits; and in such situations, the imposition of a penalty measured by the gross tax, as distinguished from the net tax remaining due, might be disastrous.

I believe that in the instant case, if any addition to tax is to be approved, the Court should have required it to be computed in accordance with the "existing administrative rule" for construction of section 291(a) of the 1939 Code, which the Internal Revenue Service publicly announced in its above-mentioned Revenue Ruling 54-427; and in accordance also with the prior decision of this Court in *Thomas A. McGovern, supra*. Both are contrary to the method of computation approved in the majority opinion herein.