Misceramic Tile, Inc. v. Commissioner.
Misceramic Tile, Inc. v. Commissioner
Docket No. 7051-65.
United States Tax Court
T.C. Memo 1968-31; 1968 Tax Ct. Memo LEXIS 267; 27 T.C.M. (CCH) 145; T.C.M. (RIA) 68031; February 20, 1968, Filed Ben F. Mitchel, Somerville Bldg., Cleveland, Miss., and W. B. Alexander, Jr., Alexander-Feduccia Bldg., Cleveland, Miss., for the petitioner. Charles G. Barnett, for the respondent. TANNENWALD
Memorandum Findings of Fact and Opinion TANNENWALD, Judge: *268 Respondent determined deficiencies in petitioner's income tax for the fiscal years ended September 30, 1962 and September 30, 1963 in the amounts of $15,201.18 and $3,611.95, respectively. Two issues remain for our decision: (1) Did petitioner properly accrue in each year amounts which were not paid into its Retirement Plan and Pension Plan until the following year? (2) Did respondent properly disallow certain amounts petitioner claimed as ordinary and necessary expenses for professional services? General Findings of Fact Some of the facts are stipulated and are found accordingly. Petitioner is a Mississippi corporation with its principal place of business in Cleveland, Mississippi, at the time of filing its petition herein. It filed its corporate income tax returns on the accrual basis for the fiscal years ended September 30, 1962 and September 30, 1963 with the district director of internal revenue, Jackson, Mississippi. Findings of Fact - Issue 1 On August 1, 1961, petitioner's board of directors adopted a Retirement Plan for Salaried Employees (hereinafter referred to as the "Retirement Plan") and a Pension Plan for Hourly Employees (hereinafter referred to as *269 the "Pension Plan"). Pursuant to these plans, petitioner entered into a Retirement Trust Agreement and a Pension Trust Agreement with the Deposit Guaranty Bank & Trust Co. of Jackson, Mississippi. Both plans, including the trusts, were determined by the district director of internal revenue, Jackson, Mississippi to be exempt from tax under section 401(a). [1]
The Pension Plan and the Retirement Plan both provide in pertinent part as follows: Section 7.01 It is the intention of the Employer, but it does not guarantee to do so, to deposit with the Trustee from time to time the funds actuarially necessary to provide the benefits under the Plan. * * * Section 9.01 Although it is the intention of the Employer that this Plan shall be continued and its contributions made regularly each year, this Plan is entirely voluntary on the part of the Employer and the continuance of the Plan and the payments thereunder are not assumed as a contractual obligation of the Employer. The Employer does not guarantee or promise to pay or cause to be paid any of the benefits provided by this Plan. * * * Section *270 9.03 The Employer specifically reserves the right, in its sole and 146 uncontrolled discretion and by official and authorized act, to moditf, suspend, in whole or in part, at any time or from time to time, and for any period or periods, or to discontinue at any time, the contributions specified in Article VII of this Plan. * * * Section 11.01 The Employer, by action of the Board of Directors, may suspend the payments to the Trust for any year and may terminate this Plan at any time. The retirement trust and pension trust agreements contained similar provisions. Petitioner's books at all times pertinent showed monthly accruals of costs of the pension and retirement plans. Petitioner's board of directors met quarterly. Financial statements were submitted to the directors at each meeting. These statements included as an expense a prorata accrual of the actuarial amount as provided in both plans. During the years in question, the statements were regularly approved by the directors without objection to the accruals. The last meeting of the directors for fiscal year 1962 was held on September 18, 1962. The financial statements for the first eleven months were submitted at that *271 meeting and included an accrual of $22,613 for contributions to the plans. The directors approved the statements without objection to the accrual. Petitioner's books and its tax return for fiscal 1962 showed a deduction of $26,233.04 on account of contributions to the plans. Of this total, $3,575.26 was paid prior to September 30, 1962 and the balance of $22,657.78 was paid on November 10, 1962. The latter amount was certified as a current liability on petitioner's audited financial statement for fiscal 1962, issued on November 20, 1962. The last meeting of petitioner's directors during fiscal 1963 was held on September 17, 1963. The financial statements for the first eleven months were submitted at that meeting and included an accrual of $21,800 for contributions to the plans. The directors approved the statements without objection to the accrual. Petitioner's books and its tax return for fiscal 1963 showed a deduction of $28,129 on account of contributions to the plans. Of this total, $2,911.97 was paid on August 21, 1963 and the balance of $25,217.04 was paid on or before March 15, 1964, the date to which petitioner's time for filing its fiscal 1963 tax return was extended *272 by respondent. This latter amount was certified as a current liability on petitioner's audited financial statements for fiscal 1963, issued on November 13, 1963. At no time did the board of directors or officers of petitioner attempt to take any action to withdraw or modify the approval of the accruals for the contributions. Respondent determined that, as of the close of each fiscal year in question, no liability had accrued for the contributions and, therefore, refused to permit petitioner to accrue the amount of the contributions prior to the time of actual payment. Prior to the close of each of the years in question, petitioner had a fixed and definite obligation to contribute the amount accrued on its books for contributions to the plans. Opinion - Issue 1 We are confronted with a very narrow question, namely, whether petitioner is entitled to a deduction for contributions to its retirement and pension plans in the actuarial amount specified in those plans in the years in which such amounts were accrued on its books and records or in the years in which they were actually paid. The plans, including the trusts, were concededly exempt during the years in question under *273 section 401(a) and there is no dispute as to the actuarial correctness of the amounts sought to be deducted. The amounts were in fact paid within the grace period specified in section 404(a)(6). That section, which is the focus for decision herein, provides as follows: Taxpayers on accrual basis. - For purposes of paragraphs (1), (2), and (3), a taxpayer on the accrual basis shall be deemed to have made a payment on the last day of the year of accrual if the payment is on account of such taxable year and is made not later than the time prescribed by law for filing the return for such taxable year (including extensions thereof). Petitioner advances two contentions: (1) that section 404(a)(6) does not require that a fixed liability be incurred prior to the close of the year and that it is sufficient if an accrual-basis taxpayer in fact pays the contribution within the grace period; and (2) that, in any event, the amounts deducted were properly accrued in the respective taxable years. Respondent vigorously disputes both contentions. 147 Petitioner's first contention is without merit. *274 Section 404(a)(6) was enacted merely to permit an accrual-basis taxpayer to use normal methods of accounting and at the same time carry out the overall mandate of the Congress that the year of payment should control, to the maximum extent possible, the time of deductions in the area of pension, profit-sharing, and similar deferred compensation payments. That section itself uses the phrase, "year of accrual," and it has been consistently held that the usual requirements of accruability must first be satisfied. Louisville Tin and Stove Company v. Commissioner, 287 F. 2d 887 (C.A. 6, 1961), affirming per curiam a Memorandum Opinion of this Court; West Virginia Steel Corporation, 34 T.C. 851, 861-862 (1960); Abingdon Potteries, Inc., 19 T.C. 23, 26 (1952); Chesapeake Carporation of Virginia, 17 T.C. 668, 672 (1951). We think, however, that petitioner is on sound ground as regards its second contention. Respondent insists that a proper reading of the relevant provisions of the plans, which are detailed in our Findings of Fact, requires the *275 conclusion that they reflect no more than a statement of intention and that, therefore, no obligation to make contributions existed prior to the end of each fiscal year. We do not agree. This is not a case where action was needed to establish the amount of a contribution. That was specified in the plans as "the funds actuarially necessary to provide the benefits." Concededly, broad powers were reserved to the board of directors but they were never exercised with respect to the years in question and, indeed, it can be argued that a proper construction of the relevant documents would preclude any such retroactive action after the close of any year. Moreover, the fact is that the amounts reflecting the contributions to the plan were incorporated in the financial statements submitted to, and approved by, the board at their quarterly meetings, the last approval in each fiscal year covering accruals for eleven months. Respondent argues that petitioner had the right to negative a measurable contribution and in effect equates that alleged right with an obligation to take affirmative action specifically directing the contribution to be made. We think that this argument goes too far under *276 the circumstances of this case. On the record as a whole, we think that the combination of the provisions of the plans and the approval by the board of directors of actual accruals on the books of petitioner form a sufficient basis for concluding that a fixed and definite obligation in the claimed amounts existed at the close of each fiscal year and that the requirements of section 404 (a)(6) were accordingly satisfied. Cf. Champion Spark Plug Co., 30 T.C. 295 (1958), affd. 266 F. 2d 347 (C.A. 6, 1959); Crow-Burlingame Co., 15 T.C. 738 (1950), affirmed per curiam 192 F. 2d 574 (C.A. 8, 1951); 555, Inc., 15 T.C. 671 (1950), affirmed per curiam 192 F. 2d 575 (C.A. 8, 1951). Findings of Fact - Issue 2 During fiscal year 1962, petitioner was billed $3,600 for designated legal services without allocation of the total charge among the specific items and without indication of the time spent either in total or with respect to each item. The designated services were rendered in connection with setting up employees' stock options, deferred compensation for executives, a life insurance plan, and the pension *277 plan; climination of one class of stock and the issuance of two shares of new stock in exchange for each three shares of old stock and the amendment to petitioner's charter necessitated thereby; a 10 percent stock dividend, including preparation of the notice to the shareholders and forms for handling fractional shares; preparation of revised bylaws; and attendance at directors' meetings and a special and the annual shareholders' meetings, at which meetings various actions were taken in relation to the foregoing. Respondent disallowed $600 of the $3,600 billed, claiming that the disallowed amount was attributable to legal services rendered in connection with the charter amendment and the stock dividend. Petitioner received quarterly bills from the transfer agent for its issued and outstanding stock as follows: Quarter ended
Quarterly transfer agent's fee
February 28, 1961
$ 326.01
May 31, 1961
315.62
August 31, 1961
497.60
November 30, 1961
3,028.09
February 28, 1962
1,309.34
May 31, 1962
517.31
August 31, 1962
386.62
November 30, 1962
543.94
February 28, 1963
636.57
May 31, 1963
556.71
August 31, 1963
436.78
November 30, 1963
3,654.54
*278 148 The bill for the November 30, 1961 quarter itemized the charges as follows: STATEMENT TO: MISCERAMIC TILE P.O. BOX 1070 CLEVELAND, MISSISSIPPI
Re: Common Stock
Services as transfer agent for Quarter ending 11-30-61 @ $500.00 per annum
$ 125.00
Maintaining 1798 accounts in excess of 500 @ 40" per annum
179.80
Issuing and transferring 2118 certifi- cates in excess of 500 per annum @ 40" each 847.20
2 Transfers involving examination of legal papers @ $2.50 each 5.00
1 Stockholders list @ $25.00 per 1,000 accounts
57.45
Reporting to Co-Agent Reporting to Company] 7 Quarters being quar- ters ending 5-31-60, 8-31-60, 11-30-60, 2-28-61, 5-31-61, 8-31-61 & 11-30-61 @ $12.50 each 87.50
DIVIDEND DISBURSEMENTS:
For each dividend:
Issuance of - checks @ $.25 each
Issuance of - checks @ $.20 each
Issuance of - checks @ $.12 1/2 each
REIMBURSEMENT FOR OUT-OF- POCKET EXPENSES:
Stationery, Printing & Supplies 1,020.46
Insured Mail Fees & Postage 345.53
Miscellaneous 23.09
OTHER SERVICES: Handling proxies, annual reports, Scrips, etc 337.06
TOTAL $3,028.09
DEPOSIT GUARANTY BANK & TRUST COMPANY
JACKSON, MISSISSIPPI BY: Trust *279 Department The bill for the quarter ended February 28, 1962 included a charge of $670.15 in connection with rounding out fractional shares resulting from the stock dividend. As of the record date for the November 1961 stock dividend, petitioner had 2,298 shareholders, of whom 470 owned less than 10 shares each. Except for the November 30, 1961 and the November 30, 1963 bills, at no time did the transfer agent's charge for stationery, printing, and supplies exceed $50. In the November 30, 1963 quarter, the bill for stationery, printing, and supplies was $889.28. The November 30, 1963 bill also included a charge of $713.90 for insured mail fees and postage. Except for this quarter and the November 30, 1961 quarter, at no time did the charge for this item exceed $125. The August 31, 1961 bill included a $70.89 charge for addressing proxies and for addressing and stuffing newsletters. The postage and insured mail fees for this quarter were $103.75. The bill for the November 30, 1962 quarter included charges totalling $110 for stencilling proxies and envelopes and for stuffing the proxies into the envelopes. The postage and insured mail fees for this quarter were $2.29. On its *280 September 30, 1962 Federal income tax return, petitioner deducted the entire amount paid with respect to the transfer agent's bills for the quarters ended November 30, 1961 through August 31, 1962. Respondent disallowed $2,400 of the $5,241.36 so claimed on the ground that it was attributable to the November 1961 stock dividend. Opinion - Issue 2 Of the $3,600 claimed by petitioner for legal services, respondent disallowed $600 as being attributable to the amendment of petitioner's charter and the declaration of the stock dividend. Petitioner concedes the nondeductibility of any amount so attributable. At the trial, petitioner merely offered testimony indicating that a fair charge for the legal services rendered in obtaining the charter amendment would be $250. No testimony was offered as to a reasonable charge for the legal services rendered in connection with the stock dividend. Moreover, the bill submitted by petitioner's attorney indicates that, aside from the mere mechanics of obtaining the charter amendment, a substantial portion of his services was attributable to the implementation of the exchange of stock covered by the amendment and to the stock dividend. On the present *281 state of the record, petitioner has failed to prove that respondent's disallowance of $600 was unreasonable. Of the $5,241.36 paid to the transfer agent for fiscal year 1962, respondent determined that $2,400 was attributable to the stock dividend. Petitioner set forth on brief a detailed calculation to support its contention that the most that can be attributed to the stock dividend is $1,492.75. This calculation was derived by an inductive analysis of the transfer agent's bill 149 for the quarter ending November 30, 1961. No testimony was offered. Even if we accept petitioner's computation as reflecting reasonable allocations as far as it goes, the fact remains that such computation contains no allocation of the transfer agent's charges for stationery, printing, supplies, and the insured mail fees. Our Findings of Fact show that the November 30, 1961 quarterly charge for stationery, printing, and supplies was $1,020.46 and that the only time this charge exceeded $50 was the November 30, 1963 quarter ($889.28), when another stock dividend was issued. Our Findings of Fact also show that the November 30, 1961 quarterly charge for insured mail fees and postage was $345.53. The *282 only other time this charge exceeded $125 was the November 30, 1963 quarter ($713.90), when another stock dividend was issued. The only explanation offered by petitioner was that the transfer agent included the stock dividend certificates in the mailing of the proxy material. However, in other quarters where the bills seem to indicate that the transfer agent mailed proxy material, we have found that the charge for insured mail fees and postage was substantially less. We conclude that petitioner has failed to meet its burden of proving that respondent's allocation of the transfer agent's fees was in error. Decision will be entered under Rule 50. Footnotes
1. All references are to the Internal Revenue Code of 1954 unless otherwise indicated.↩