TERRY C. ROSANO, FORMERLY TERRY C. WHITTAKER, A.K.A. RANDY SCOTT, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 6051–64. Filed August 26, 1966.

*John H. Duhig*, for the petitioner.
*William L. McCulley* and *Louis J. DeReuil*, for the respondent.

The Commissioner determined deficiencies in income tax against petitioner for the years 1959, 1960, and 1961 and additions to tax pursuant to section 6653(a), I.R.C. 1954, in the following amounts:

| Year | Deficiency | Addition to tax, sec. 6653(a) |
|---|---|---|
| 1959 | $2,228.00 | $111.40 |
| 1960 | 2,261.57 | 113.08 |
| 1961 | 925.99 | 46.30 |

At issue is whether petitioner failed to report all of her income earned during the years involved, and if so was that failure due to negligence or intentional disregard of rules and regulations. Also remaining at issue, is whether petitioner was self-employed during those years.

FINDINGS OF FACT

The stipulated facts and exhibits are incorporated herein by this reference.

Petitioner, Terry C. Rosano, residing at 1430 Northwest 173 Terrace, Miami, Fla., filed income tax returns for the calendar years 1959, 1960, and 1961 with the district director of internal revenue, Jacksonville, Fla. During those years she was married to Harry E. Whittaker but was separated from him.

Petitioner is an entertainer and during the years 1959, 1960, and 1961 performed at various nightclubs in Miami Beach, Fla., and at the Club Peachtree in Atlanta, Ga. She is, and was during these years, a member of American Guild of Variety Artists, a branch of the Associated Actors and Artists of America which is affiliated with the AFL–CIO. Her stage name is Randy Scott, and her act is that of an "exotic" dancer.

At all times during 1959, 1960, and 1961, when petitioner performed her act for compensation she did so under standard American Guild of Variety Artists contracts. In a typical contract, in which the nightclub was referred to as the "Operator" and the performer as the "Artist," it was provided in part as follows:

1. The Operator hereby warrants that he is the operator herein at the present time and for the duration of this contract, and engages the Artist and the Artist hereby accepts said engagement, to present his act under the direction, supervision and control of the Operator, * * *

During these years petitioner was entirely and solely dependent for her livelihood on the compensation or emoluments received by her for the services she rendered in the nightclubs where she worked.

In her returns for 1959 and 1960 petitioner reported receipts of $6,500 in each year from her activities as a "singer and dancer." In her return for 1961 she stated that she worked only 12 weeks and reported receipts of $1,500.

During 1961, petitioner worked at Club 23, Miami Beach, Fla., for 7 weeks; at Club Piccadilly, Miami Beach, Fla., for 6 weeks; at Place Pigalle, Miami Beach, Fla., for 12 weeks; and Club Peachtree, Atlanta, Ga., for 2 weeks. For her 2 week engagement at Club Peachtree, Atlanta, Ga., during 1961, petitioner was paid $700, less 10-percent commission to the Roland Muse Agency which was deducted by management of Club Peachtree. The net amount of $630 received by petitioner during the taxable year 1961 was not reported on her Federal income tax return for that year.

On December 26, 1955, S.A.M. Corp. was incorporated under the laws of Florida. During the years involved herein the corporation operated a B-girl nightclub under the name of Place Pigalle at 215 22d Street, Miami Beach, Fla. For about 30 days prior to July 22, 1960, the State Beverage Department of Florida had conducted an undercover investigation of the Place Pigalle and its B-girl operations. At 1:50 a.m. on July 22, 1960, agents of the State Beverage Department of Florida conducted a raid on the premises of Place Pigalle. Certain practices considered to be in violation of Florida law were observed by the agents, who seized the following records of S.A.M. Corp. from the premises:

1  drink tally sheet for employees
1  payroll book for witholding and social security
1  tally sheet (ledger) listing payments
1  standard daily journal 1960
1  bank book (check)

These corporate records were seized by District Supervisor J. E. Little of the State Beverage Department of Florida who gave a receipt therefor dated July 22, 1960.

On July 26, 1960, Harry Ridge, president of S.A.M. Corp., filed a complaint for replevin in the Justice of the Peace Court, district No. 1, Dade County, Fla., to recover the aforementioned records from the State Beverage Department of Florida. While in the possession of the State Beverage Department of Florida, these records were photostated and then physically were turned over to Judge Hugh F. Duval, Jr., justice of the peace, district No. 1, Dade County, Fla. Photostatic copies of these original records were retained by the beverage department.

On July 29, 1960, the State of Florida filed suit against S.A.M. Corp., d.b.a. Place Pigalle, and others (including Harry Ridge) to enjoin a criminal nuisance in the Circuit Court, 11th judicial district, Dade County, Fla.

On September 8, 1960, a hearing was had on a request for a temporary injunction in the criminal nuisance suit, and on that day Justice of the Peace Duval, in response to a subpoena, physically turned over the seized originals of the corporate records to the clerk of the Circuit Court in which the criminal nuisance suit was pending. On September 15, 1960, the Circuit Court issued a temporary injunction in favor of the State, and denied a motion to quash service of the subpoena on Justice of the Peace Duval, thereby retaining jurisdiction of the records.

On September 21, 1960, Justice of the Peace Duval entered a Final Order on the Complaint For Replevin which directed the beverage department to return these records to Harry Ridge and S.A.M. Corp. on the grounds that the search and seizure conducted by the beverage department was illegal and deprived the plaintiff of due process under both the State and Federal constitutions.

On October 12, 1960, a final decree enjoining specified practices was entered with the consent of the parties in the criminal nuisance suit which, as set forth above, had been filed on July 29, 1960. In the "Bill To Enjoin Nuisance And For Injunctive Relief" filed in that suit the State of Florida alleged, among other things, that incident to the sale of alcoholic beverages at the Place Pigalle female entertainers engaged in immoral and indecent dances; that such female entertainers, while they were not performing, sat and mingled with the male patrons soliciting them to purchase drinks for such female entertainers; that the female entertainers received a percentage of profit from each such alcoholic beverage solicited by them and purchased by the male patrons; and that in soliciting such purchases of drinks, the female entertainers engaged in certain specified intimate sexual play with the patrons and "do offer to commit or to engage in and do commit and engage in lewdness, assignation, and/or prostitution with said male patrons."

The recitals in the final decree entered October 12, 1960, in the criminal nuisance suit included the following:

On September 8, 1960, this cause came on to be heard on the relator's request for a temporary injunction, and as a result thereof a temporary injunction was entered by this Court on September 15, 1960. The respondents, through their undersigned counsel, state that it would appear that some of the acts and things complained of in relator's Bill of Complaint may have existed on the premises on July 22, 1960, and prior to that time, although respondents specifically deny any knowledge or notice of the existence of the acts and things complained of in the aforesaid Bill of Complaint prior to the presentation of the evidence by the relator on September 8, 1960. The respondents further state that they agree with the relator that the acts and matters alleged in the aforesaid Bill of Complaint should not be condoned and should not exist, and specifically have requested the opportunity to take such action as is necessary to prevent an occurrence of such activity. Based on the above, the following final decree to enjoin is hereby stipulated and agreed upon for the entry by this Court.

On July 11, 1961, about 9 months after the final decree in the criminal nuisance suit, S.A.M. Corp. filed a motion in that proceeding for return of the books and records which were then still in the custody of the clerk of the Circuit Court. The motion recited the history of the situation, the seizure of the books and records, the replevin action, and the criminal nuisance proceeding. The concluding allegation pointed out that all litigation relative to the matter had been terminated and completed, and the motion asked for a return of the books and records. On July 17, 1961, an order was entered directing the clerk to deliver the seized records to S.A.M. Corp. The records were then delivered to the possession of S.A.M. Corp. On or about June 26, 1962, the seized records were either lost or destroyed and presently are unavailable.

Thereafter, on July 9, 1962, agents of the Internal Revenue Service, Miami, Fla., obtained from the State Beverage Department of Florida the photostatic copies of the seized records. For purposes of the instant case, the parties have stipulated that the records obtained by the beverage department from the premises of the Place Pigalle on July 20, 1960 [1] were obtained pursuant to an illegal search and seizure in violation of the rights of S.A.M. Corp. under the fourth amendment to the Federal Constitution.

Among the seized records were certain drink tally sheets. A typical sheet for a particular day contained a list of female employees or entertainers and after each name were symbols apparently indicating the number of drinks to be credited to such person. Also among the seized documents were certain tally ledger sheets listing "commissions" payments to the female employees or entertainers for

---

[1] Although the stipulation refers to July 20, 1960, it appears elsewhere in the stipulation that the records were obtained on July 22, 1960.

pay periods from October 8, 1957, through July 18, 1960. The entries therein relating to petitioner Terry Rosano, a.k.a. Randy Scott, were as follows:

TALLY LEDGER SHEETS

| Pay period | 1957 Total commissions paid | Days worked | Pay period | 1958 Total commissions paid | Days worked |
|---|---|---|---|---|---|
| Oct. 8 | $66.75 | 5 | Dec. 31, 1957 | $31.50 | 6 |
| Oct. 15 | 87.75 | 6 | Jan. 7 | 108.25 | 7 |
| Oct. 22 | 61.75 | 3 | Jan. 14 | 61.00 | 5 |
| Oct. 29 | 21.25 | 4 | Jan. 21 | 58.25 | 6 |
| Nov. 5 | 73.50 | 6 | Jan. 28 | 28.50 | 6 |
| Nov. 12 | 50.75 | 4 | Feb. 4 | 58.00 | 6 |
| Nov. 19 | 40.50 | 3 | Feb. 11 | 57.50 | 5 |
| Nov. 26 | 69.50 | 6 | Feb. 18 | 29.25 | 5 |
| Dec. 3 | 89.75 | 5 | Feb. 25 | 65.75 | 5 |
| Dec. 10 | 69.50 | 6 | Mar. 4 | 65.00 | 6 |
| Dec. 17 | 120.50 | 6 | Mar. 11 | 117.50 | 5 |
| Dec. 24 | 47.50 | 5 | Mar. 18 | 33.00 | 5 |
| Total | 799.00 | 59 | Total | 713.50 | 67 |

| Pay period | 1959 Total commissions paid | Days worked | Pay period | 1960 Total commissions paid | Days worked |
|---|---|---|---|---|---|
| May 25 | $31.25 | 5 | Dec. 28, 1959 | $65.50 | 6 |
| June 1 | 16.50 | 4 | Jan. 4 | 154.50 | 6 |
| June 8 | 45.75 | 6 | Jan. 11 | 104.50 | 6 |
| June 15 | 54.25 | 5 | Jan. 18 | 276.50 | 7 |
| June 22 | 35.00 | 6 | Jan. 25 | 43.50 | 3 |
| June 29 | 70.50 | 6 | Feb. 1 | Off | |
| July 6 | 39.00 | 5 | Feb. 8 | 118.50 | 6 |
| July 13 | 129.75 | 6 | Feb. 15 | 112.50 | 5 |
| July 20 | 77.50 | 5 | Feb. 22 | 137.50 | 6 |
| July 27 | 32.00 | 5 | Feb. 29 | 65.50 | 7 |
| Aug. 3 | 19.50 | 4 | Mar. 7 | 92.50 | 5 |
| Aug. 10 | 85.50 | 6 | Mar. 14 | 54.00 | 6 |
| Aug. 17 | 118.50 | 6 | Mar. 21 | Off | |
| Aug. 24 | 58.50 | 6 | Mar. 28 | 10.50 | 3 |
| Aug. 31 | 181.00 | 6 | Apr. 4 | 56.00 | 6 |
| Sept. 7 | 66.25 | 6 | Apr. 11 | 46.90 | 6 |
| Sept. 28 | 75.00 | 6 | Apr. 18 | 31.60 | 5 |
| Oct. 5 | 37.75 | 6 | Apr. 25 | 46.20 | 6 |
| Oct. 12 | 78.50 | 6 | May 2 | 43.80 | 5 |
| Oct. 19 | 103.00 | 5 | May 9 | 58.95 | 6 |
| Oct. 26 | 98.50 | 6 | May 16 | Off | |
| Nov. 2 | 145.00 | 6 | May 23 | 72.30 | 6 |
| Nov. 9 | 61.00 | 5 | May 30 | 80.85 | 7 |
| Nov. 16 | 82.00 | 5 | June 6 | 135.40 | 6 |
| Nov. 23 | 60.50 | 6 | June 13 | 106.65 | 6 |
| Nov. 30 | 103.00 | 5 | June 20 | 47.85 | 6 |
| Dec. 7 | 84.00 | 6 | June 27 | 35.10 | 6 |
| Dec. 14 | 63.00 | 5 | July 4 | 22.85 | 2 |
| Dec. 21 | 48.00 | 4 | | | |
| Total | 2,100.00 | 158 | Total | 2,019.95 | 139 |

OPINION

RAUM, *Judge:* Apart from the stipulation of facts the only evidence presented by petitioner, after giving her name and identifying the returns filed for the 3 years, was to say "Yes, sir" in response to her counsel's question whether the returns were "true and correct."

We found that answer entirely unconvincing, and it could hardly overcome the presumptive correctness of the Commissioner's determination. *Louis Halle*, 7 T.C. 245, 247–248, affirmed 175 F. 2d 500 (C.A. 2), certiorari denied 338 U.S. 949. Petitioner's counsel refused to present any further evidence, taking the position that the burden of proof was not upon petitioner by reason of the illegal seizure of the Place Pigalle records. We hold that there was no such shift in the burden, and that the issues before the Court must be decided against petitioner for failure of proof.

Rule 32 of our Rules of Practice provides that "the burden of proof shall be upon the petitioner," with certain exceptions not applicable here. Petitioner was wholly unjustified in taking the position that the burden of proof shifted because the Commissioner relied upon the seized nightclub's records in determining the amount of "commissions" received by her in her "B-girl" activities at the Place Pigalle.

At the outset it should be noted that several of the adjustments made by the Commissioner in determining the deficiencies had nothing whatever to do with those "commissions" and were entirely unrelated to the seized records. Indeed, the parties have stipulated as to a number of those adjustments involving a variety of deductions claimed on the returns. However, there remain three unresolved issues unconnected with the "commissions," namely (a) whether petitioner received unreported income in the amount of $3,165 in 1961 as compensation for her services as an entertainer, (b) whether part of the underpayment of tax for each year was due to negligence or intentional disregard of rules and regulations, and (c) whether petitioner was self-employed so as to render applicable the so-called self-employment tax. We shall consider these three issues after disposing of the principal matter presented relating to the illegality of the seizure as it affects the "commissions" issue.

1. *The illegal seizure and the "commissions" issue.*—The parties have attempted to place before the Court the broad issue whether illegally seized documents, inadmissible in evidence in a criminal trial, may nevertheless be admitted in a civil proceeding—a matter in respect of which the Courts of Appeals are said to be in disagreement [2] and upon which the Supreme Court has not spoken.[3] We think no such issue is presented by this record.

---

[2] Thus, the Government cites *Compton* v. *United States*, 334 F. 2d 212 (C.A. 4), as being in conflict with *Rogers* v. *United States*, 97 F. 2d 691 (C.A. 1), and *Lord* v. *Kelley*, 223 F. Supp. 684 (D. Mass.), appeal dismissed 334 F. 2d 742 (C.A. 1), certiorari denied 379 U.S. 961.

[3] Cf. *One 1958 Plymouth Sedan* v. *Pennsylvania*, 380 U.S. 693, where the Court ruled that illegally obtained evidence was inadmissible in a forfeiture proceeding which it held was criminal in nature, thus avoiding a ruling upon whether such evidence would have been admissible in a civil case.

The documents seized by the Florida authorities belonged to the S.A.M. Corp., which operated the Place Pigalle nightclub, and whose property was the subject of the illegal search and seizure. No property of petitioner was searched or seized. The books and records were not hers, they were not kept on her premises, and she had no responsibilities in connection with them. It is established law that in such circumstances she has no standing to question the legality of the search and seizure, which was not illegal as to her. *Wong Sun* v. *United States*, 371 U.S. 471, 491–492; *Hall* v. *United States*, 150 F. 2d 281 (C.A. 5). The mere fact that the documents contained information pertaining to her is not sufficient to give her standing to object to the seizure of the records or to their use as evidence against her.[4]

In these circumstances, petitioner's entire case in respect of the seized records collapses. Since she has no standing to challenge the illegality of the seizure and since the seizure was not illegal *as to her*,[5] there was no basis whatever for the contention that the burden of proof shifted to the Government. We do not mean to suggest that if the Commissioner's determination had been based on legally inadmissible evidence there would be any change in the burden of proof; for the Commissioner's determination may often rest upon hearsay or other inadmissible evidence, and we know of no rule of law calling for a review of the materials that were before the Commissioner in order to ascertain whether he relied upon improper evidence so that the burden of proof might be shifted to him. Cf. *William O'Dwyer*, 28 T.C. 698, 703, affirmed 266 F. 2d 575 (C.A. 4), certiorari denied 361 U.S. 862. However, no such inadmissible evidence (i.e., inadmissible as to petitioner) is involved herein.

Since the burden of proof was properly upon petitioner, it was up to her to show that the Commissioner erred in attributing to her "commissions" in the amounts of $3,150, $4,039.90, and $840 for the years 1959, 1960, and 1961, respectively. These amounts were apparently arrived at by projecting for each of the years the "commissions" shown by the Place Pigalle records as having been paid to her during portions of the years 1959 and 1960. If the Commissioner was wrong in that determination—and we cannot tell whether he

---

[4] We recognize that the Government, in an effort to obtain a ruling on the broad issue whether illegally seized records may be used in civil proceedings, attempted at the hearing to "concede" that petitioner has standing to raise the issue. But the parties may not by concession thrust upon the Court issues not presented by the record, just as they may not bind the Court by stipulations as to questions of law. Cf. *Swift* v. *Hocking Valley Ry. Co.*, 243 U.S. 281, 289; *Estate of Sanford* v. *Commissioner*, 308 U.S. 39, 51; *London-Butte Gold M. Co.*, 116 F. 2d 478, 479–480 (C.A. 10); *Commissioner* v. *Cummings*, 77 F. 2d 670, 672 (C.A. 5).

[5] Moreover, even if the records were inadmissible as to her so as to give her standing to challenge their being received as affirmative evidence against her, there is authority for holding that they may be used defensively to contradict her testimony that her returns were true and correct or otherwise for purposes of impeachment. Cf. *Walder* v. *United States*, 347 U.S. 62; *Compton* v. *United States*, 334 F. 2d 212, 217–218 (C.A. 4).

was right or wrong—the burden was upon petitioner to show it. Instead of attempting to carry that burden, her counsel refused to present evidence (other than petitioner's conclusory testimony that her returns were true and correct), insisting that the burden was upon the Government. Since there was thus a complete failure of proof, we must approve the Commissioner's determination as to the "commissions" which he attributed to her.

2. *Other issues.*—As already noted, *supra* at 686, three other issues are presented for decision. These are unrelated to the seized records, and regardless of petitioner's position in respect of presenting evidence as to the "commissions," there was no excuse whatever for insisting that the Government had the burden of proof on these three issues. We hold that she has failed to carry that burden.

(a) *Unreported 1961 compensation.*—The Commissioner determined that petitioner realized unreported income as an entertainer in 1961 from Club 23, Piccadilly Club, and Club Peachtree in the amounts of $1,365, $1,170, and $630, respectively. He accordingly increased her taxable income for 1961 by the sum of these amounts, namely, $3,165.

Not only did petitioner fail to offer any evidence to show that the Commissioner erred as to this item, but the stipulated facts furnish a foundation for his determination. Although petitioner's 1961 return stated that she worked only 12 weeks in 1961, the stipulation of facts shows that she worked that year at Club 23 for 7 weeks, at Club Piccadilly for 6 weeks, at Place Pigalle for 12 weeks, and at Club Peachtree for 2 weeks. Moreover, the stipulation further shows that she received a net amount of $630 for her 2-week engagement as an entertainer at Club Peachtree, which admittedly was not reported on her return. Her reported $1,500 receipts for 12 weeks in 1961 appear to be related to her work at Place Pigalle, and the Commissioner was fully justified in charging her with earnings at the other three night clubs. She has failed to show that the amounts attributed to her are incorrect, and the Commissioner's determination must therefore be approved.

(b) *Negligence.*—Similarly, petitioner has not sustained her burden of proving that no part of the underpayment of tax for each year was due to "negligence or intentional disregard of rules and regulations." *Cleveland Chiropractic College* v. *Commissioner*, 312 F. 2d 203, 207 (C.A. 8); *Carroll F. Schroeder*, 40 T.C. 30. The only evidence in respect of this determination pursuant to section 6653(a), I.R.C. 1954, was the fact set forth in the stipulation that petitioner paid $15 during 1959 and 1960 for "Preparation of return." There is no indication whatever as to what she disclosed to the person preparing her returns, and we have nothing before us that would serve as a basis for a finding that no part of the underpayment for each

year was due to negligence or intentional disregard of rules and regulations.

(c) *Self-employment tax.*—Finally, there remains for decision whether petitioner was self-employed so as to be subject to the "self-employment" tax under section 1401, I.R.C. 1954.[6] The positions of the parties appear to be reversed here, for it is the Commissioner who has determined that petitioner is not subject to the tax, and it is the petitioner who contends that she is liable therefor.

A self-employment tax is imposed on an individual earning income from a trade or business but not where the services he renders are performed as an employee. Sec. 1402, I.R.C. 1954.[7] The definition of an employee is contained in section 3121(d), and includes among others "any individual who under the usual common law rules applicable in determining the employer-employee relationship, has the status of an employee."

The contracts under which petitioner worked provided that she was to perform her act "under the direction, supervision and control" of the nightclub in which she was working. Under the terms of these contracts petitioner was to be treated as an employee of the nightclubs in which she worked as defined in section 3121(d) and the regulations promulgated thereunder.[8] Having no evidence before

---

[6] SEC. 1401. RATE OF TAX.

In addition to other taxes, there shall be imposed for each taxable year, on the self-employment income of every individual, a tax * * *.

[7] SEC. 1402. DEFINITIONS.

(a) NET EARNINGS FROM SELF-EMPLOYMENT.—The term "net earnings from self-employment" means the gross income derived by an individual from any trade or business carried on by such individual, less the deductions * * *

(b) SELF-EMPLOYMENT INCOME.—The term "self-employment income" means the net earnings from self-employment derived by an individual * * * during any taxable year * * *

(c) TRADE OR BUSINESS.—The term "trade or business", when used with reference to self-employment income or net earnings from self-employment, shall have the same meaning as when used in section 162 * * *, except that such term shall not include—

   *        *        *        *        *        *        *

   (3) the performance of service by an individual as an employee * * *

(d) EMPLOYEE AND WAGES.—The term "employee" * * * shall have the same meaning as when used in chapter 21 (sec. 3101 and following, relating to Federal Insurance Contributions Act).

[8] Sec. 31.3121(d)–1 [Employment Tax Regs.] Who are employees.

   (c) *Common law employees.* * * *

   (2) Generally such relationship exists when the person for whom services are performed has the right to control and direct the individual who performs the services, not only as to the result to be accomplished by the work but also as to the details and means by which that result is accomplished. That is, an employee is subject to the will and control of the employer not only as to what shall be done but how it shall be done. In this connection, it is not necessary that the employer actually direct or control the manner in which the services are performed; it is sufficient if he has the right to do so. The right to discharge is also an important factor indicating that the person possessing that right is an employer. Other factors characteristic of an employer, but not necessarily present in every case, are the furnishing of tools and the furnishing of a place to work, to the individual who performs the services. In general, if an individual is subject to the control or direction of another merely as to the result to be accomplished by the work and not as to the means and methods for accomplishing the result, he is an independent contractor. An individual performing services as an independent contractor is not as to such services an employee under the usual common law rules. Individuals such as physicians, lawyers, dentists, veterinarians, construction contractors, public stenographers, and auctioneers, engaged in the pursuit of an independent trade, business, or profession, in which they offer their services to the public, are independent contractors and not employees.

us to the contrary, we find that petitioner was not subject to a self-employment tax in any of the years involved.

*Decision will be entered under Rule 50.*