DARON INDUSTRIES, INC., FORMERLY AIREQUIPT, INC., ET AL.,[1] PETI-
TIONERS v. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 2647-71—2652-71. Filed September 24, 1974.

*Sidney Gelfand* and *Wallace Musoff*, for the petitioners.
*Larry Kars* and *Warren Dill*, for the respondent.

**OPINION**

RAUM, *Judge:* The Commissioner determined income tax defi-
ciencies against petitioners as follows:

| Petitioner | Docket No. | Taxable year | Deficiency | Addition to tax for delinquency— sec. 6651(a), I.R.C. 1954 |
|---|---|---|---|---|
| Daron Industries, Inc., formerly Aire-quipt, Inc. | 2647-71 | Jan. 1–Dec. 31, 1963____ | $1,874 | _____ |
|  |  | Jan. 1–Dec. 31, 1964____ | 49,397 | $431 |
| Airequipt, Inc_____ | 2648-71 | June 8–Dec. 31, 1964____ | 351,757 | 4,948 |
| Raygram-Hornstein, Inc., successor by merger to Raygram Corp. and Horn-stein, Inc. (old Raygram Corp.). | 2649-71 | July 20–Dec. 31, 1964___ | 48,662 | 621 |
| Raygram-Hornstein, Inc., successor by merger to Raygram Corp. and Horn-stein, Inc. (old Hornstein, Inc.). | 2650-71 | July 20–Dec. 31, 1964___ | 19,516 | 245 |
| Hornstein of California, Inc_____ | 2651-71 | July 20–Dec. 31, 1964_____ |  | 374 |
| Vernon Photographic Corp_____ | 2652-71 | Aug. 1–Dec. 31, 1964___ | 8,522 | 89 |

In or around June or July of 1964 petitioner Daron Industries, Inc.
(Daron), organized a number of subsidiary corporations which joined

[1] Cases of the following petitioners are consolidated herewith: Airequipt, Inc., docket No. 2648-71; Raygram-Hornstein, Inc., successor by merger to Raygram Corporation and Hornstein, Inc. (old Raygram Corporation), docket No. 2649-71; Raygram-Hornstein, Inc., successor by merger to Raygram Corporation and Hornstein, Inc. (old Hornstein, Inc.), docket No. 2650-71; Hornstein of California, Inc., docket No. 2651-71; and Vernon Photographic Corp., docket No. 2652-71.

with it in filing a consolidated corporation income tax return for the calendar year 1964. This return was filed 6 days after its due date, including extensions of time granted by the Commissioner. Prior to 1964 Daron had filed separate corporation income tax returns. Although the 1964 return reported substantial taxable income, subsequent consolidated returns reported substantial losses. The following issues are presented for decision: (1) Was the 1964 consolidated return a valid one so as to permit the carryback of consolidated losses of later years to the consolidated income of 1964; (2) if this was not a valid consolidated return, then was the 1965 "merger" of Raygram Corp. and Hornstein, Inc., to form Raygram-Hornstein, Inc., all second-tier subsidiaries of Daron, a reorganization within the meaning of section 368(a)(1)(F), I.R.C. 1954, such that net operating losses sustained by Raygram-Hornstein, Inc., for the taxable years ended January 31, 1966, and January 31, 1967, may be carried back in accordance with section 172, I.R.C. 1954, in computing the taxable income of Raygram Corp. and Hornstein, Inc., for the calendar year 1964, pursuant to section 1.381(b)-1(a)(2) of the Income Tax Regulations; (3) if this was not a valid consolidated return and if the merger of Raygram Corp. and Hornstein, Inc., was not a reorganization within the meaning of section 368(a)(1)(F), then may the net operating losses sustained by Raygram-Hornstein, Inc., for the taxable years ended January 31, 1966, and January 31, 1967, be carried back and deducted by Daron for the calendar year 1964; (4) is Daron entitled to a net operating loss carryback deduction for the calendar year 1963 for that portion of the consolidated net operating losses sustained during the taxable year ended January 31, 1966, attributable to its subsidiaries which were not in existence in 1963; and (5) were the delinquency penalties properly imposed for the calendar year 1964 pursuant to section 6651(a), I.R.C. 1954. The facts have been stipulated.

*Facts.*—Petitioner Daron was organized under the laws of the State of New York on February 25, 1943. Its original name was Airequipt Manufacturing Co., Inc. On July 1, 1963, its name was changed to Airequipt, Inc., and on July 16, 1964, it was changed to Daron Industries, Inc. Daron filed its corporation income tax return for the calendar year 1963 in New York, under the name Airequipt, Inc., and duly paid its liability for income tax shown thereon in the amount of $58,643. Additional income tax of $3,851 was assessed on October 29, 1965, and a tentative carryback allowance of $5,587 was subsequently made. David Aronoff was the chairman of the board of Daron (then Airequipt, Inc.) in 1963, and he signed its tax return for that year.

In or around June and July of 1964 Yalham, Inc. (Yalham), Nealon, Inc. (Nealon), PHN Realty, Inc. (PHN Realty), Raygram

Corp. (Raygram), Hornstein, Inc. (Hornstein), and Hornstein of California, Inc. (Hornstein of California), were organized. All of the outstanding stock of Yalham, PHN Realty, and Nealon was owned from their dates of incorporation by Daron. Nealon owned all of the outstanding stock of Raygram, Hornstein, and Hornstein of California from their dates of incorporation. Hornstein acquired all of the outstanding stock of Vernon Photographic Corp. (Vernon) which had been organized in 1961. All of these corporations, with the exception of Hornstein, which was incorporated in Illinois and Hornstein of California, which was incorporated in California, were incorporated in New York. In or around July of 1964 Yalham's name was changed to Airequipt, Inc., and in or around February of 1965 Hornstein of California's name was changed to Raygram-Hornstein of California, Inc. (Raygram-Hornstein of California).

Daron filed a consolidated corporation income tax return for the calendar year 1964 on September 21, 1965, 6 days after the due date of this return including extensions of time allowed by the Commissioner, as set forth more fully below. Included in this return as subsidiaries, and indicated as such on Form 851, Affiliations Schedule, which was attached thereto, were:

| | |
|---|---|
| Airequipt, Inc. (formerly Yalham, Inc.) | Raygram Corp. |
| | Hornstein, Inc. |
| PHN Realty, Inc. | Hornstein of California, Inc. |
| Nealon, Inc. | Vernon Photographic Corp. |

Also attached to this return were Forms 1122 which had been executed by each of the subsidiaries, and the duplicate originals of which had previously been filed around June of 1965, as hereinafter stated. This form was the authorization by each subsidiary of its inclusion in a consolidated income tax return of Daron for 1964 and for subsequent taxable years when so required by the consolidated return regulations, as well as each subsidiary's consent to be bound by the provisions of the consolidated return regulations.

The 1964 consolidated return showed consolidated taxable income of $723,010, on which income tax of $351,448 was due. Because of previous estimated payments of $375,000 which had been made with Forms 7004 filed by Daron and its subsidiary corporations, as set forth more fully below, the overpayment of $23,552 [2] indicated on this return was duly refunded to Daron. For the calendar year 1964 the taxable income of Daron and each of its subsidiaries, prior to adjustments for

---

[2] Although this is the amount which appears on the return, which accompanied the stipulation of facts, it is nevertheless inconsistent with the amount of $23,522 which the parties stipulated as having been refunded.

intercompany transactions and unrealized profit on inventory, as reported on statements attached to the return, was as follows:

| Name | Taxable income (loss) prior to adjustments | Name | Taxable income (loss) prior to adjustments |
|---|---|---|---|
| Daron Industries, Inc_____ | $107, 060 | Hornstein, Inc_____ | $35, 772 |
| PHN Realty, Inc_____ | Inactive | Hornstein of California, | |
| Airequipt, Inc_____ | 618, 971 | Inc _____ | 51, 101 |
| Nealon, Inc_____ | (5, 746) | Vernon Photographic Corp_ | 16, 503 |
| Raygram Corp_____ | 88, 751 | | |

Prior to filing the 1964 consolidated return Daron and its subsidiaries had timely filed on a consolidated basis Form 7004 (dated March 14, 1965), which is an "Application by a Corporation for Automatic Extension of Time [3 months] to File U.S. Income Tax Return." The form was signed by Robert Moss, Daron's president, and payment of $300,000 accompanied the form. Subsequently, on June 15, 1965, a request for an additional extension of time, to September 15, 1965, for filing the consolidated income tax return of Daron and its subsidiaries was filed by petitioners, and the request was granted. This request had been signed by David Aronoff, chairman of the board, and indicated that "the tax for the consolidated companies will approximate $375,000"; accordingly, an additional payment of $75,000 was made therewith. In June of 1965, the required consents embodied in Forms 1122 were filed by the subsidiaries named above with the respective district directors of the districts in which said corporations were located. As previously indicated, the duplicate originals of these consent forms were also attached to the 1964 consolidated return which was filed thereafter.

Petitioners' return for 1964 was completed by their accountants, Lybrand, Ross Bros. & Montgomery, and delivered to petitioners' office on September 13, 1965. However, it was not signed or mailed until September 21, 1965. Daron's president and financial officer, Robert Moss, suffered a serious cardiac and circulatory illness during the summer of 1965 which caused him to be hospitalized from June 2, 1965, to June 21, 1965, and from June 24, 1965, to July 22, 1965. He underwent surgery on July 11, 1965, involving venous ligation in both legs. After his discharge from the hospital he was ordered to remain at rest with his legs elevated for a period of 2 months. He returned to petitioners' office on September 21, 1965, and signed the return which was then mailed that day to the district director, Manhattan district. As indicated above, an overpayment of tax in the amount of $23,552 shown on the consolidated return was duly refunded to Daron.

Sometime prior to April 14, 1965, Daron and its subsidiaries applied for permission to change their accounting period for Federal income tax purposes from a taxable year ended December 31, to a taxable year ended January 31, the first taxable year to be the short period January 1, 1965, to January 31, 1965. On April 14, 1965, the Internal Revenue Service issued its "terms letter" which set out certain conditions to which Daron and each subsidiary had to agree before permission to change accounting periods would be granted. The terms were accepted in writing and permission to change accounting periods was granted on May 12, 1965, subject to the agreed-upon terms. Accordingly, a consolidated corporation income tax return was filed by Daron and those subsidiaries previously indicated for the short taxable year January 1, 1965, to January 31, 1965. This return reported a consolidated loss of $95,906.[3]

On February 2, 1965, Raygram-Hornstein, Inc. (Raygram-Hornstein), was organized under the laws of Delaware to operate the businesses previously conducted by Raygram and Hornstein. As of that date all assets and liabilities of Raygram and Hornstein were transferred to the new corporation. Prior to this reorganization, Raygram, a New York corporation, had been engaged in the business of camera merchandising in the eastern region of the United States; Hornstein, an Illinois corporation, had been similarly engaged in the Midwest. The directors, president, and corporate secretaries of the two corporations were identical. After the reorganization the directors, chairman of the board, president, and secretary of Raygram-Hornstein held the same positions they had previously held in Raygram and Hornstein. In addition, Raygram-Hornstein qualified to do business in the same States in which both former corporations had been either qualified or incorporated. Nealon continued to be the sole shareholder of Raygram-Hornstein. Raygram-Hornstein of California continued as a separate subsidiary of Nealon.

Daron filed consolidated corporation income tax returns in New York for the taxable years ended January 31, 1966, and January 31, 1967, with the same subsidiary corporations as previously indicated, except that Raygram-Hornstein replaced Raygram and Hornstein. These returns reported consolidated losses of $205,625 and $769,311, respectively. The taxable income of Daron and each of its subsidiaries for these years, prior to adjustments for intercompany transac-

---

[3] Pursuant to the terms letter one-tenth of the net operating loss for the short period Jan. 1, 1965, to Jan. 31, 1965, was to constitute a deduction for each year of the following 10-year period. Accordingly, there is no question here relating to any possible carryback of that loss to the years here involved.

tions, unrealized profit on inventory, etc., as reported on statements attached to the returns for those years, was as follows:

| Name | Taxable income (loss), prior to adjustments, for taxable year ended Jan. 31 | |
| --- | --- | --- |
| | 1966 | 1967 |
| Daron Industries, Inc. | ($11, 991) | ($7, 613) |
| Airequipt, Inc. | 110, 333 | 96, 592 |
| Nealon, Inc. | (896) | (1, 228) |
| Raygram-Hornstein, Inc. | (298, 938) | (613, 034) |
| Raygram-Hornstein of California, Inc. | (106, 325) | (206, 661) |
| Vernon Photographic Corp., Inc. | 13, 700 | 31, 017 |

On September 13, 1966, Daron filed Form 1139, Application for Tentative Carryback Adjustment, on which a net operating loss from the taxable year ended January 31, 1966, was claimed as a deduction for the consolidated return year 1964, and the separate return year 1963. The loss claimed as a carryback deduction for 1963 was that attributable to Daron only. Attached to this claim was the agreement required by section 1.1502–19A.(b), Income Tax Regs. The claim was allowed and a refund of $103,028 was paid to Daron (including the $5,587 previously indicated as allowed for 1963). Similarly, on July 14, 1967, Daron filed another tentative refund claim, on which a net operating loss from the taxable year ended January 31, 1967, was claimed as a deduction for the consolidated return year 1964. Attached to this claim was the agreement required by section 1.1502–19A.(b), Income Tax Regs.; it was allowed and a refund of $254,007 was paid to Daron.

In his deficiency notices to petitioners the Commissioner disallowed the consolidated loss carryback to the taxable year ended December 31, 1964, and imposed additions to tax pursuant to section 6651(a), stating:

It has been determined that Daron Industries, Inc. & Subsidiaries did not timely exercise the privilege of filing a consolidated return for the taxable year ended December 31, 1964 and therefore are not entitled to file a consolidated return for said taxable year and are also not entitled to a consolidated loss carryback * * *

Since your income tax return for the taxable year ended December 31, 1964 was not filed within the time prescribed by law and you have not shown that such failure to timely file your return was due to reasonable cause, 5 percentum of the tax has been added thereto in accordance with the provisions of section 6651(a) of the Internal Revenue Code of 1954.

He allowed limited loss carrybacks for Daron to the taxable years ended December 31, 1963 and 1964, from the taxable years ended January 31, 1966 and 1967, respectively, and for Hornstein of California to the taxable year ended December 31, 1964, from the taxable years ended January 31, 1966 and 1967. He also made other adjust-

ments to petitioners' taxable income for those years which have been conceded by petitioners as correct.

1, 2, and 3. *Consolidated net operating loss carryback to 1964.*—Petitioners filed a consolidated corporation income tax return for 1964 6 days after the due date of the return, including extensions of time granted by the Commissioner. On that return they reported substantial taxable income; indeed the only corporation showing a loss on that return was Nealon. Subsequently, petitioners applied for permission to change their accounting period from one ending December 31 to one ending January 31, the first taxable year to be the short period January 1, 1965, to January 31, 1965. Permission was granted, subject to the condition that petitioners agree that any net operating loss incurred during this short year would be carried forward in equal portions to the 10 succeeding taxable years. Petitioners agreed to this condition and filed a consolidated corporation income tax return for the short taxable period January 1, 1965, to January 31, 1965, which reported a consolidated loss of $95,906. On February 2, 1965, two of Daron's subsidiaries, Raygram and Hornstein, combined to form Raygram-Hornstein, Inc. This new corporation replaced Raygram and Hornstein as a member of the affiliated group on the consolidated corporation income tax returns filed for the taxable years ended January 31, 1966 and 1967. Both of these returns reported considerable consolidated losses, substantial portions of which were attributable to the new corporation, Raygram-Hornstein.

The parties agree that if the 1964 return filed by Daron and its subsidiaries was a valid consolidated return then the consolidated net operating losses incurred for the taxable years ended January 31, 1966 and 1967,[4] could be carried back to that year. See sec. 1.1502–31A (a) (4), Income Tax Regs.; Rev. Rul. 64–93, 1964–1 C.B. (Part 1) 325. However, if the 1964 return was not a valid consolidated return, then the 1966 and 1967 consolidated net operating losses must be apportioned among the corporations which sustained them and be carried back to 1964 on a separate basis. See sec. 1.1502–31A (b) (6) and (d) (1), Income Tax Regs. This latter alternative is less advantageous to petitioners for two reasons, (1) a substantial portion of the taxable income reported on the 1964 return was attributable to Airequipt, Inc., which also realized profits for the taxable years ended January 31, 1966 and 1967, and (2) a substantial portion of the losses experienced in the taxable years ended January 31, 1966 and 1967, was attributable to Raygram-Hornstein, a corporation which the Commissioner contends

[4] Losses sustained during the taxable year ended Jan. 31, 1968, are not at issue since the short taxable year Jan. 1 to Jan. 31, 1965, is the last year to which such losses could be carried back. See secs. 1.1502–31A(a)(4) and 1.1502–2A(f), Income Tax Regs.; sec. 7701(a)(23), I.R.C. 1954.

was not in existence in 1964 and whose losses cannot therefore be carried back to that year. Thus, in order to salvage at least part of their net operating loss deduction in the event we hold that the 1964 return was not a valid consolidated return, petitioners argue alternatively that the "merger" of Raygram and Hornstein was a reorganization within the meaning of section 368(a)(1)(F), I.R.C. 1954, and that, therefore, any net operating losses sustained by Raygram-Hornstein during the taxable years ended January 31, 1966 and 1967, can be carried back and considered in computing the taxable income of Raygram and Hornstein for 1964, pursuant to section 1.381(b)–1(a)(2) of the Income Tax Regulations. Finally, if we hold that the 1964 return was not a valid consolidated return and that the "merger" of Raygram and Hornstein was not a reorganization within the meaning of section 368(a)(1)(F), petitioners argue that the net operating losses sustained by Raygram-Hornstein for the taxable years ended January 31, 1966 and 1967, may be carried back and deducted by Daron for 1964.[5] Thus, these latter two issues need be reached only if we hold that the 1964 return was not a valid consolidated return; since we find that this was a valid consolidated return, we do not pass upon these issues.

The Commissioner argues that a proper election had not been made to file a consolidated return, since the return in question was filed 6 days after its due date as extended. The starting point for consideration of this issue is section 1501 of the 1954 Code which provides as follows:

SEC. 1501. PRIVILEGE TO FILE CONSOLIDATED RETURNS.

An affiliated group of corporations shall, subject to the provisions of this chapter, have the privilege of making a consolidated return with respect to the income tax imposed by chapter 1 for the taxable year in lieu of separate returns. The making of a consolidated return shall be upon the condition that all corporations which at any time during the taxable year have been members of the affiliated group consent to all the consolidated return regulations prescribed under section 1502 prior to the last day prescribed by law for the filing of such return. The making of a consolidated return shall be considered as such consent. * * *

The consents required by the second sentence of these provisions were reflected in the various Forms 1122 which were in fact executed and timely filed in June of 1965, about 2 months "prior to the last day [as extended] prescribed by law for the filing of such return." Moreover, the third sentence of section 1501 provides that the "making of a consolidated return shall be considered as such consent," and Daron

---

[5] Only net operating losses sustained by Raygram-Hornstein during the taxable years ended Jan. 31, 1966 and 1967, are at issue on this branch of the case since all of the other corporations sustaining such losses in those years were also in existence in 1964, and, therefore, their share of these losses can be carried back to 1964 on a separate basis.

in fact did file such a consolidated return in September of 1965, thus seemingly fulfilling the requirements of section 1501. However, the Commissioner refuses to treat the return as having been filed on a consolidated basis merely because it was filed 6 days after its due date, and in support of his position he relies solely upon section 1.1502–10A(a) of the regulations, which provides: [6]

Sec. 1.1502–10A Exercise of privilege.

(a) *When privilege must be exercised.* The privilege of making a consolidated return under section 1502 for any taxable year of an affiliated group must be exercised at the time of making the return of the common parent corporation for such year. For this purpose, the return is considered as made on the due date of such return (including any extensions of time granted by the Commissioner), regardless of the actual previous date of filing. Under no circumstances can such privilege be exercised at any time thereafter. * * * If the privilege is exercised at the time of making the return, separate returns cannot thereafter be made for such year. * * *

While it is possible to give these provisions a reading which supports the Commissioner's position, we think that a different interpretation, particularly in the light of the history of the regulations, is more consonant with their purpose and would prevent the unduly harsh result that would otherwise ensue. In referring to such result as unduly harsh we have in mind the fact that the deficiencies attributable to this issue are in the aggregate of more than $400,000, that losses actually sustained and otherwise available for carrybacks would eliminate such deficiencies, that the sole impediment to such carryback is the contention that the privilege of making the consolidated return was exercised too late merely because the return itself was filed 6 days late, notwithstanding that the various corporations executed and timely filed the necessary binding consents (Forms 1122) for a consolidated return prior to the date that the return was due, and that "tentative returns" (Forms 7004) had been timely filed on a consolidated basis with the consequence that the final return was required to be made upon the same basis in the absence of certain conditions which in fact were not present here.[7]

---

[6] These provisions are applicable only to taxable years beginning before Jan. 1, 1966. See sec. 1.1502–0(b), Income Tax Regs. The substantially different provisions of sec. 1.1502–75 are applicable to later years, see sec. 1.1502–0(a), and our decision herein is not intended to be dispositive of any similar question arising under those regulations governing the post-1965 years.

[7] Sec. 1.1502–10A(b) provides:

Sec. 1.1502–10A  Exercise of privilege.

(b) *Effect of tentative returns.* In no case will the privilege under paragraph (a) of this section be considered as exercised at the time of making a so-called "tentative return" (made, for example, in order to obtain an extension of time for making the return required by law). *However, if any such tentative return is made upon the basis of a consolidated return or a separate return, the return required by law must be made upon the same basis,* unless upon the making of the return required by law (either a separate return or a consolidated return, as the case may be) the payments theretofore made and to be

We turn to an examination of the history of the critical provisions of section 1.1502–10A(a). The predecessor of these provisions was originally promulgated under the Revenue Act of 1928 as art. 10(a) of Regs. 75 which read as follows:

> (a) *Must be Exercised at Time Parent Files Return.*
>
> The privilege of making a consolidated return for any taxable year of an affiliated group must be exercised at the time of filing the return of the parent corporation for such year. Under no circumstances can such privilege be exercised at any time thereafter. If the privilege is exercised at the time of filing the return, separate returns can not thereafter be filed for such year. * * *

The wording was changed slightly in art. 10(a)(1) of Regs. 78, issued under the Revenue Act of 1932, as follows:

> (a) *When Privilege Must be Exercised.*
>
> (1) The privilege of making a consolidated return under these regulations for any taxable year of an affiliated group must be exercised at the time of making the return of the common parent corporation for such year. Under no circumstances can such privilege be exercised at any time thereafter. If the privilege is exercised at the time of making the return, separate returns can not thereafter be made for such year. * * *

The regulation was thereafter reissued from time to time in substantially the same form under the various succeeding revenue acts up to and including the Internal Revenue Code of 1939. See art. 10(a)(1), Regs. 89 (under the 1934 Act); art. 10(a), Regs. 97 (under the 1936 Act); art. 10(a), Regs. 102 (under the 1938 Act); sec. 23.10 (a), Regs. 104 (under the 1939 Code); sec. 33.10(a), Regs. 110 (Consolidated Excess Profits Tax Regulations issued 1941); sec. 24.10(a), Regs. 129 (under the 1939 Code in respect of years after 1949).

If the validity of the 1964 return in this case were considered under these regulations, it seems clear that it would not be disqualified as a consolidated return. The first sentence specified that the privilege must be exercised "at the time of making the return"—a condition that was satisfied herein—and the second sentence provided merely that "Under no circumstances can such privilege be exercised at any time thereafter"—a condition having no relevance to this case, since no attempt was made here to exercise the privilege after Daron ("the common parent corporation") had made its 1964 return. Plainly, what the "under no circumstances" sentence was seeking to achieve was to prevent the exercise of the privilege to file a consolidated return after the common parent corporation had already filed a separate return. It was in that context that the words "at any time thereafter"

---

made are adjusted in a manner satisfactory to the Commissioner. [Emphasis supplied.]

Although these two sentences appear to be somewhat in conflict with one another, it is clear from the second sentence, as conceded by the Government on brief (p. 12), that Daron and its subsidiaries were required to file a consolidated return in the absence of compliance with the "unless" clause which follows the italicized language, and it does not appear that there was any such compliance here.

were used in that sentence; in short, the phrase "at any time thereafter" merely referred back to "the making of the return of the common parent" in the first sentence.

The regulation in the form which is now before us first appeared in 1955 in T.D. 6140, 1955–2 C.B. 323, and the only significant change in respect of the present problem was the insertion of a new sentence between the first and second sentences of the previous version. That new sentence reads: "For this purpose, the return is considered as made on the due date of such return (including any extensions of time granted by the Commissioner), *regardless of the actual previous date of filing.*" (Emphasis supplied.) In our judgment it was directed at a matter that was entirely different from the one now before us, and was not intended to change the result in respect of the present problem that would have been reached under the earlier version of the regulation.

As we view the new sentence, it was intended to deal with the effect of the filing of a return prior to its due date. At least several situations come to mind in which the earlier version of the regulation could have caused difficulty without this new sentence, e.g., where the parent corporation had filed a separate return prior to the due date and where it should have been permitted as a matter of basic fairness to elect thereafter to file a consolidated return, provided that such election were made on or before the date on which the return was due to be filed. The "under no circumstances" sentence of the earlier version would have prevented such election, and the insertion of the new sentence would seem to have overcome that difficulty. Conversely, if the common parent had filed a consolidated return prior to the due date, it should be permitted to withdraw that return and replace it with a timely separate return—a result that would arguably be facilitated by the new sentence. But obviously, having actually filed a separate return prior to the due date, the parent corporation would be effectively precluded by the "under no circumstances" sentence from exercising the privilege of filing a consolidated return *after* the due date.

The insertion of the new sentence in our opinion was meant to govern a situation where a return and an election had in fact been made prior to the due date. We think it hardly likely that it was intended to convert the former second ("under no circumstances") sentence into a death sentence for a consolidated return which would theretofore have withstood attack. In our opinion the third sentence in the new regulation (second in the old), although superficially supporting the Government's position here, was not meant to have that effect in the light of the history of these provisions.[8]

---

[8] A radically different regulation which is applicable to the years after 1965 (see fn. 6 *supra*) is at least some evidence that the regulation before us (which reflects merely the insertion of a single sentence in an established formulation) was intended to be read realistically in the light of its historical setting.

4. *Net operating loss carryback from fiscal 1966 to 1963.*—In a short and unilluminating treatment on brief petitioners contend that Daron (Airequipt, Inc., in 1963) is entitled to a net operating loss carryback deduction for the calendar year 1963 (when it filed a separate return) in respect of the consolidated net operating loss of fiscal 1966. The computations in the deficiency notice, the allegations in the pleadings, and the arguments on brief leave us in considerable confusion as to precisely what is involved on this branch of the case. Certainly, there is no evidence that petitioner filed any claim for refund of 1963 taxes, apart from the Application For Tentative Carryback Adjustment which was in fact initially allowed in the full amount of $5,587, as claimed, in respect of that portion of the 1966 consolidated loss' claimed to have been attributable to Daron's individual operations. To be sure, the amount of the carryback loss attributable to Daron appears to have been reduced to some extent in the deficiency notice, but there is nothing before us to indicate that Daron has not now received in full the benefit of the 1966 carryback to 1963 to the extent that it reflected Daron's entire deductible individual 1966 loss. Nor does there appear to be any allegation or contention that Daron is entitled to a decision reflecting any overpayment for 1963. Accordingly, as far as we can assess the dimensions of the issue from the confusing materials placed before us, it is simply whether Daron is entitled to a carryback to 1963 of so much of the consolidated fiscal 1966 net loss attributable to the operations of its affiliates that would be sufficient to erase the $1,874 deficiency determined by the Commissioner against Daron individually for 1963. Those affiliates were not in existence in 1963 (apart from Vernon Photographic Corp. which did not sustain any loss in fiscal 1966), and therefore had not filed any individual returns for 1963 to which they could carry back their respective 1966 individual losses. We hold that such 1966 losses attributable to Daron's affiliates could not be carried back to Daron's 1963 individual return.

The regulations relied upon by the Commissioner, which are applicable to taxable years beginning before January 1, 1966,[9] are set forth in the margin.[10] These regulations require the segregation of that portion of any consolidated net operating loss which is attributable to corporations which filed separate returns or joined in the consolidated return of another group for the year to which the loss is to be carried,

[9] See sec. 1.1502–0(b). The pertinent regulations applicable to subsequent years (see sec. 1.1502–0(a)) appear in sec. 1.1502–79, and could require a different result for years beginning after Dec. 31, 1965. Petitioners do not dispute the fact that they are inapplicable here.

[10] Sec. 1.1502–31A(b) *Computations.*

(6) *Apportionment of consolidated net operating loss.* If an affiliated group filing a consolidated return sustains a consolidated net operating loss for the taxable year within the provisions of section 172, relating to the net operating loss deduction, and if—

(i) There are included as members of such group one or more corporations which made

and provide that such portion may be used by such corporations as carrybacks in their respective separate returns or in the consolidated returns of the other affiliated group. It is clear under these provisions that the only loss which Daron can carry back from fiscal 1966 to its separate return for 1963 is that portion of the consolidated 1966 loss that is attributable to its own operations, a carryback which, so far as this record discloses, has already been allowed.

This is not a matter of first impression in this Court. Thus, in *Trinco Industries, Inc.*, 22 T.C. 959, the taxpayer sought to carry back to a year in which it had filed a separate return, and to apply against its income for that year, losses sustained by a subsequently formed subsidiary with which it had joined in a consolidated return for the year in which the losses were incurred. Interpreting regulations [11] which are in all important respects comparable to those presently before us, we held that the losses attributable to the subsidiary could not be so carried back and applied, stating, 22 T.C. 959, 964:

> We think it is plain from a fair reading of these regulations that the only loss that petitioner can use either as a carry over or a carry-back to a year when it filed a separate return is merely that portion of the consolidated net loss attributable to its own affairs.

Subsequently, in *American Trans-Ocean Navigation Corporation* v. *Commissioner*, 229 F. 2d 97 (C.A. 2), affirming a Memorandum Opinion of this Court,[12] the Second Circuit held that a loss sustained in a

---

separate returns, or joined in a consolidated return filed by another affiliated group, either in a preceding taxable year or in a succeeding taxable year, * * *

\* \* \* then the portion of such consolidated net operating loss attributable to such corporations severally shall be determined, such portion in the case of any such corporation being determined in an amount proportionate to the net losses (capital net losses and ordinary net losses alike) of the several affiliated corporations having net losses, to the extent that such losses were taken into account in the computation of the consolidated net operating loss.

Sec. 1.1502-31A  Basis of tax computation.

(d) *Net operating loss deduction, excess charitable contributions, excess section 175 deductions, and dividend carryover before or after consolidated return*—(1) *Net operating loss deduction.* The consolidated net operating loss of an affiliated group shall be used in computing the consolidated net operating loss deduction notwithstanding that one or more members of the group in the taxable year in which such loss originates make separate returns (or join in a consolidated return made by another affiliated group) for a subsequent taxable year (or in the case of a carryback computation for a preceding taxable year), but only to the extent that such consolidated net operating loss is not attributable to such corporations. *Such portion of such consolidated net operating loss as is attributable to the several corporations making separate returns (or joining in a consolidated return made by another affiliated group) for a subsequent taxable year (or in the case of a carryback computation for a preceding taxable year) shall be used by such corporations severally as carryovers or as carrybacks in such separate returns or in such consolidated returns of the other affiliated group.* * * * [Emphasis supplied.]

[11] Secs. 24.31(b) and (b)(7), and 24.31(d) of Regs. 129 are comparable to sec. 1.1502-31 (A)(b)(6) and (d)(1), respectively, of the Income Tax Regulations.

[12] This Memorandum Opinion held that *Trinco Industries, Inc.*, 22 T.C. 959, was dispositive of the issue. See 13 T.C.M. 839.

consolidated return year, which was attributable to a subsidiary, could not be carried back to a separate return year of the parent corporation which was prior to the creation of the subsidiary. Interpreting regulations [13] which were again comparable in all important respects to those presently before us, the court stated (229 F. 2d 97, 98) :

> These regulations plainly establish a scheme whereby only the part of a consolidated net loss which is attributable to a particular corporation can be used by that corporation as a carryback to a year in which it filed a separate return. Since the taxpayer consented to these regulations it is bound by them now. * * * Since none of the 1949 loss was attributable to this taxpayer's operations, it is not entitled to carry the loss back to 1947.

Cf. also *Phinney* v. *Houston Oil Field Material Co.*, 252 F. 2d 357, 362–363 (C.A. 5) ; *Midland Management Co.*, 38 T.C. 211, vacated and remanded upon stipulation of the parties 316 F. 2d 190 (C.A. 8).

To be sure, the Seventh Circuit recently reversed our decision in *Nibur Building Corp.*, 54 T.C. 835, in which we had followed *Trinco* and *American Trans-Ocean.* 444 F. 2d 1020. And although we think that the Seventh Circuit misconceived the operative scope of the applicable regulations,[14] we do not have to take a definitive position on this matter now, since the present case arises in the Second Circuit, and we are bound to follow its decision in the *American Trans-Ocean* case.[15] Cf. *Jack E. Golsen*, 54 T.C. 742, 756–757, affirmed 445 F. 2d 985 (C.A. 10), certiorari denied 404 U.S. 940. Accordingly, we hold that Daron is not entitled to a net operating loss carryback to 1963 for that portion of the consolidated net operating loss sustained for the taxable year ended January 31, 1966, which is not attributable to its own operations.

5. *Delinquency penalties.*—Section 6651(a), I.R.C. 1954, provides for certain additions to tax in the event a return is filed after its due date, "unless it is shown that such failure [was] due to reasonable cause and not due to willful neglect." Section 301.6651–1(c), Proced. & Admin. Regs., provides in part that "If the taxpayer exercised ordinary

---

[13] Sec. 23.31(*d*)(7) and (*f*) of Regs. 104, as amended by T.D. 5244, 1943 C.B. 460–461, 462, are comparable to sec. 1.1502–31(A)(b)(6) and (d)(1), respectively, of the Income Tax Regulations.

[14] The scheme of the regulations focuses upon the segregation of a loss sustained by a corporation which has filed a separate return for a year to which a loss is to be carried, and calls for the computation of that portion of the consolidated loss *attributable to that corporation* so that it may be used as a carryback to its separate return year. It does not provide for the carryback of an apportioned loss to an earlier separate return of a *different corporation,* as permitted by the Seventh Circuit in *Nibur.*

[15] In any event, *Nibur* is at least technically distinguishable from the present case. There, the Seventh Circuit emphasized that the business conducted by the subsidiary which sustained the loss and which was not in existence during the carryback tax year of the parent had in fact been conducted by the parent during that tax year. 444 F. 2d at 1022. In the instant case, on the other hand, the record fails to show that the businesses of the subsidiaries which gave rise to the fiscal 1966 losses had been conducted by Daron in 1963. And of course, to the extent that this is material, petitioners have failed in their burden of proof.

business care and prudence and was nevertheless unable to file the return within the prescribed time, then the delay is due to a reasonable cause." In this respect we note that the absence of "willful neglect" is not enough; the taxpayer must also show that the failure was due to reasonable cause. See *Logan Lumber Co.* v. *Commissioner*, 365 F. 2d 846, 853 (C.A. 5); *West Virginia Steel Corporation*, 34 T.C. 851, 860. The burden of proof is thus upon the taxpayer. Cf. *Terry C. Rosano*, 46 T.C. 681, 688.

The sole reason advanced by petitioners for their late filing of the 1964 return was the illness of Robert Moss, Daron's president and financial officer. However, the duty to file the return was the corporate obligation of the taxpayer and not the individual responsibility of Mr. Moss. That return could just as readily have been signed by Daron's chairman of the board, David Aronoff, who had signed not only Daron's 1963 return but also several of the Forms 1122 in June 1965, as well as the June 14, 1965, request for an additional extension of time within which to file the 1964 consolidated return on behalf of Daron and its subsidiaries. If there was any justifiable reason why Mr. Aronoff could not have signed the 1964 consolidated return itself and arranged for its timely filing, the record fails to establish it.[16] We need not consider other possibilities—e.g., why, if Mr. Moss's signature was considered essential by the taxpayer, the return could not have been brought to his home for signature some 6 days earlier. It would serve no useful purpose to speculate on such possible alternatives. The point is that it was Daron's corporate responsibility to see to it that the return was timely signed and filed, and it has not carried its burden of proof to establish that the failure to do so was due to reasonable cause.

In order to give effect to our conclusions herein as well as certain concessions made by the parties,

*Decisions will be entered under Rule 155.*

---

[16] Petitioners argue on brief that Mr. Moss as the financial officer was the appropriate person to review the return rather than Mr. Aronoff. However, the record does not establish that Mr. Aronoff lacked sufficient competence for this purpose. Counsel's suggestion to this effect on brief is no substitute for proof.