MEARL A. ROSE, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Rose v. Comm'r
Docket Nos. 19640-81, 18931-82.
United States Tax Court
T.C. Memo 1984-537; 1984 Tax Ct. Memo LEXIS 138; 48 T.C.M. (CCH) 1331; T.C.M. (RIA) 84537; October 4, 1984. John Freeman Blake and Michael P. McCabe, for the petitioner. Donna J. Rice, for the respondent. PARKER
*138 MEMORANDUM FINDINGS OF FACT AND OPINION PARKER, Judge: In these consolidated cases, respondent determined deficiencies in and additions to petitioner's Federal income tax as follows: Docket No.
Year
Deficiency
Sec. 6653(a) Addition [1]
19640-81
1978
$1,453
$72.65
18931-82
1979
$1,180
$59.00
1980
$1,111
$55.55
*139 After concessions, [2] the issues for decision are (1) whether petitioner is entitled to a charitable contribution deduction in 1978, 1979, and 1980 for amounts purportedly contributed to the Universal Lambdoidal Church, ULC Charter No. 24926, a chapter of the Universal Life Church, Inc., of Modesto, California, and (2) whether petitioner is liable for the section 6653(a) addition for negligence or intentional disregard of rules and regulations for such years. *140 *141 FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts, as orally amended at trial, and exhibits attached thereto are incorporated herein by this reference. Petitioner resided in Concord, California at the time he filed the petitions in these consolidated cases. Petitioner filed Federal income tax returns (Forms 1040) for taxable years 1978, 1979, and 1980 with the Internal Revenue Service Center in Fresno, California. Petitioner has an Associate of Arts degree from Duchess Community College of the State University of New York as well as a Bachelor of Science degree from the University of Utah, with a major in Political Science and a minor in Sociology. Petitioner has never attended a School of Theology, nor has he ever attended any religious seminaries. During the years in issue, petitioner was employed full time (40 hours per week) as a dispatcher with the City of Oakland Fire Department. Barbara P. Card (hereinafter Card), a co-worker of petitioner, was also employed as a dispatcher with the City of Oakland Fire Department for such years. Petitioner and Card are not related by blood or marriage, nor has either one ever served *142 in a supervisory capacity to the other with respect to their employment by the City of Oakland Fire Department. Petitioner was baptized into the Methodist denomination as an infant. Petitioner regularly attended church as a child and was active in the Methodist Church as a teenager.However, petitioner severed his association with the Methodist Church at approximately age 19 because of discrepancies he perceived between the officially pronounced tenets of the church and its actual practices concerning issues such as bigotry. After leaving the Methodist Church, petitioner investigated several other denominations. He attended services at Catholic and Unitarian Churches a few times. Petitioner attended Mormon Church services over a period of several years. Petitioner was impressed by the Mormon religion, particularly the practice, as he understood it, that Bishops of the Mormon Church were not supported by the church and could receive no compensation for performance of religious services, instead being required to provide their own support by maintaining employment outside of the church. Petitioner received instruction in the Mormon faith but did not convert thereto. Petitioner *143 subsequently stopped attending Mormon Church services, once again because of discrepancies he perceived between the teachings and actual practices of the Mormon religion. In 1977, petitioner first heard of the Universal Life Church, Inc., of Modesto, California (ULC, Inc. of Modesto), while watching a broadcast of "60 Minutes," a popular television news program. Petitioner was particularly impressed by ULC, Inc. of Modesto's doctrine that "each person is entitled to believe that which is right for him as long as it doesn't infringe upon the rights of others." In approximately September of 1977, petitioner contacted ULC, Inc., of Modesto and was subsequently ordained as a minister thereof. Petitioner received no training from ULC, Inc., of Modesto concerning the tenets of the Universal Life Church prior to his ordination. [3] Petitioner received credentials of ministry from ULC, Inc., of Modesto evidencing his ordination as a minister thereof, along with additional literature instructing petitioner on the formation of his own chapter of the Universal Life Church. Petitioner then talked to Card and David Walker (Walker), [4] a friend of petitioner, and proposed that they form their *144 own chapter of the Universal Life Church, to which Card and Walker agreed. Thereafter, on or about October 6, 1977, petitioner, Card, and Walker executed a church agreement under the name of the Universal Lambdoidal Church (sometimes referred to hereinafter as the Lambdoidal Church or the church), [5] and submitted the agreement to ULC, Inc., of Modesto.The agreement was signed by petitioner, Card, and Walker as pastor, secretary, and treasurer, respectively. The agreement provided, interalia, that: 1. This Church agrees to abide by all the Corporate Laws of the local, state, and federal governments. * * * 3. This Church will have a governing body of at least three people: Pastor, Secretary, and Treasurer. This agreement is signed by the three, individually. * * *. *145 In response to this agreement, Charter No. 24926, dated October 6, 1977, was granted to the Universal Lambdoidal Church by ULC, Inc., of Modesto. The charter certificate provided, in part, that: Neither party to this agreement is the general agent of the other. The Universal Life Church, Inc. issues this certificate in consideration of the signatories' promise that they will indemnify, save harmless, and defend the Universal Life Church, Inc. from all liability from damages to persons or property in any suit at law arising out of this agreement. By this agreement, the Universal Life Church, Inc. hereby authorizes this congregation to open a bank account, or accounts with any other financial institutions, in the name of the Universal Life Church, Inc.
Petitionerdid not receive a copy of a publication entitled the Universal Life Church Handbook at the time he received the charter agreement in 1977, nor was petitioner aware of the existence of any such publication at that time. Petitioner first became aware of the existence of such a handbook in 1979 or 1980 and first received a copy of the Universal Life Church Handbook at some time in the latter part of 1980. The initial *146 resolution passed by the Lambdoidal Church's board of directors, also dated October 6, 1977, provided, interalia, as follows: Be it further resolved, that this Church believes only in that which is right . . . . and every person has the right to decide what is right for him or her; That membership and participation in this Church shall be without regard to race, creed, sex, sexual orientation, color or national origin; That among the purposes of this Church is the promotion of the general and spiritual welfare of our communities, and the protection of the natural and civil rights of all citizens; That this Church shall be governed by a Board of Directors (also known as Trustees) consisting of the Pastor, a Secretary, and a Treasurer; That the initial Board of Trustees or Directors shall consist of Dr. Mearl A. Rose, Pastor, Barbara P. Card, Secretary, and David M. Walker, Treasurer; That said Directors or Trustees shall continue to serve in that capacity until such time as they, by majority vote shall name their successors. Aseparate resolution by the church's board of directors (hereinafter the board), dated November 10, 1977, authorized establishment of a checking *147 account with any branch of the Hibernia Bank. The resolution further provided that withdrawals from the account could only be made upon signature of any two of the board's members, after general authorization for an expenditure by resolution of the board. Checking account number XXX-X466-9 was subsequently opened with the Hibernia Bank in the church's name, with petitioner, Card, and Walker having signature authority on this account (church account).Account number XXX-X466-9 was the only checking account maintained by the church during the years in issue. By a continuing resolution dated November 17, 1977, the board authorized the pastor and/or treasurer to enter into a rental agreement for premises to house petitioner and his family, the church offices and records, and for any other uses considered necessary and church related in the judgment of the pastor or the board. The church's funds were to be used to pay for the rental of such premises, [6] as well as all utilities related to the use thereof. [7]
*148 Three separate apartmentswere leased during the years at issue. The lease agreements concerning these apartments were all executed by petitioner in his individual name. These apartments were used by petitioner and his son as their personal residence at all times during the years in issue. These apartments may generally be described as a two-bedroom condominium, complete with kitchen, dining room, living room, and bathroom. Petitioner's apartment was also the address given for the church's location, and was the focal point of petitioner's activities concerning the church (to be discussed in more detail below) for the years in issue. Checks drawn on the church account were used to make all rental payments on these various apartments, and also to pay all utility bills connected with their use. The following table summarizes the total amounts of rent and utility bills paid with funds from the church account during the years in issue. 1978
1979
1980
Rent
$3,694.50
$4,822.50
$2,640.00
Pacific Gas & Electric
292.46
429.77
587.85
Pacific Telephone
560.82
631.45
815.96
Concord Cable TV
78.76
116.64
86.41
Totals:
$4,626.54
$6,000.36
$4,130.22
*149 The above table does not purport to include all obligations paid from the church account during the years in issue. As indicated by the above table, telephone service was maintained at these apartments, the telephone purportedly listed in thechurch's name. Two separate lines were available, numbers 676-7682 and 676-7683. Petitioner used either line whenever and as he wanted, whether for personal purposes or purported church business. The total amounts shown above for telephone services include all charges incurred with respect to numbers 676-7682 and 676-7683 and paid with checks drawn on the church account in 1978, 1979, and 1980.However, checks drawn on the church account were also used to pay for service to the numbers listed below as follows: Phone Number
Year
Amount Paid
827-1752
1979
$42.10
827-3147
1979
177.18
676-6633
1980
293.83
There is no evidence of record to indicate that these latter telephone numbers were related to the church in any manner. The cable TV service carried during 1978, 1979, and 1980 was the typical cable TV service. In addition to standard cable channels, the viewer had the option to select certain *150 subscription channels, such as Home Box Office and Showtime. In all, a total of approximately 29 television channels and approximately 27 FM radio channels were available to a cable subscriber.[8] The record does not disclose whether petitioner subscribed to all or only a portion of the potentially available cable channels, but it is clear he did subscribe to some portion thereof. During the years in issue, checks were drawn on the church account and used for other purportedly church-related purposes. In December of 1978, checks in the amount of $50 each were issued to Card and Walker, respectively, allegedly to partially defray the expenses they incurred in attending monthly board meetings.[9] In April of 1979, a dining room table and eight chairs were purchased at a price of $211.94 from Levitz Furniture for use at the apartment. *151 Each time petitioner and the church moved to a new apartment during the years in issue, a truck was rented with funds from the church account and used to move petitioner's belongings and those of the church to the new apartment. In June of 1979, $570.39 was expended from the church account to pay a common carrier to move household goods of petitioner and/or his family and the church from Colorado to Concord, California. [10]
*152 As with the payment of rent and utilities on the apartments occupied by petitioner, his son, and also porportedly the church, each expenditure of the above amounts was authorized by a resolution of the church board, consisting of petitioner, Card, and Walker. In practice, all of the resolutions were prepared and typed in advance and then presented to and considered by the board. Some of the resolutions were prepared by petitioner, the others by Card. No changes were ever made in any of the resolutions submitted to the board, and all such resolutions were passed. Other than as required to consider pending resolutions, the church's board met infrequently on an as-needed basis, usually no more than once a month, if that often. The content of these meetings centered on the need for a future resolution. No minutes of any such meetings were recorded or maintained.Other than the resolutions that were subsequently passed and a disbursements and receipts ledger, no written record of any board meetings was maintained. As noted earlier, the various apartments in which petitioner and his son lived during the years at issue also served as the focal point of the church's activities for *153 those years. "Meetings" or "worship services" were held there on an average of once a week. Only two people were in attendance at these meetings or services.Prayer was sometimes said. According to quarterly reports petitioner filed with the ULC, Inc., of Modesto, a total of three baptisms and two ordinations were performed through the church during 1978, 1979, and 1980. These ordinations appear to have been of the same type as that received by petitioner, granted upon request made to ULC, Inc., of Modesto. Specifically, we note that no preparation or counselling to be a minister was required prior to ordination by petitioner's church, but instead was provided only if requested. The baptisms performed followed no prescribed ritual. Indeed, whether or not a ritual was to be performed at all and, if elected, the manner in which the ritual was conducted, was left entirely to the discretion of the person to be baptized. No marriages were performed during those years. During the years in issue, the vast majority of the activities conducted by the church through petitioner consisted of providing personal counselling services of various types, principally in regard to sexually transmitted *154 diseases, and principally to members of the local homosexual community.The name of the Lambdoidal Church itself is derived from the Greek letter Lambda, a symbol purportedly used by the homosexual community, and expressly adopted by the church as a means of attracting the attention of members of the homosexual community. It is petitioner's belief that members of the homosexual community and their problems, particularly their health problems, have been unjustly ignored by what he calls the "mainline" churches. Counselling services are provided in many forms, including personal interviews, telephone conversations, and mail correspondence. The goal of the counselling services provided is two-fold: to educate people as to sexually transmitted diseases and problems associated therewith and also to re-establish the self-esteem of persons afflicted with such diseases, "to make them feel better about themselves." In connection with the rendition of counselling services, the church also occasionally distributed educational pamphlets concerning different aspects of sexually transmitted diseases. [11] These pamphlets were not prepared by or for the church, but were instead of a type generally *155 available to and distributed by numerous organizations and groups concerned with these health problems. The Lambdoidal Church, through petitioner, also provides personal counselling to teenagers on a variety of subjects, including sexually transmitted diseases, parental problems, drug problems, and peer pressures. Once again, the counselling provided was designed primarily to re-establish the individual's self-esteem. [12] Petitioner estimates that six or seventeenagers received counselling services during the years at issue. In addition, the various apartments occupied by petitioner and his son was also allegedly used by the church on an emergency basis as a "drop-in shelter" for runaways and other teenagers who found themselves temporarily homeless. *156 Counselling services were also provided to incarcerated prison inmates. The services were provided in various forms, including telephone conversations, mail correspondence, and on one occasion an actual in-prison visit. Petitioner estimated that three inmates had received counselling services during the years in issue. Most of the persons seeking counselling services provided by the Lambdoidal Church through petitioner did so as the result of a personal referral. However, the availability of such services were also sometimes advertised in local classified advertisements, as finances would permit. The church also advertised the availability of free Notary Public services and legal marriages. [13]
During the years in issue, petitioner, in addition to his fulltime job as a Fire Department employee, also performed volunteer work at the Mount Diablo Free Clinic (hereinafter the clinic). The clinic was jointly sponsored by the County of Contra Costa Health Services Department, Diablo Valley Community *157 Health Association, Inc., and a local community college, Diablo Valley College. The clinic was also involved with the provision of health services, counselling services, and dissemination of information relating to sexually transmitted diseases. The clinic was open two days a week, Tuesdays and Thursdays, from 6:30 p.m. to 9:00 p.m. Petitioner normally performed volunteer work there on both days, working an average of four to six hours each week. No one else associated with the Lambdoidal Church during the years in issue performed any volunteer work at the clinic during these years. Some of the people with whom petitioner worked at the clinic knew he was a minister, others did not. The nature of petitioner's volunteer work at the clinic varied.He was principally a "clinic manager," responsible for supervising the work of other volunteers. In addition, petitioner interviewed patients, provided counselling services, and performed various clerical duties. Petitioner also assisted the clinic's doctors with matters that required no specialized training. Petitioner generally helped out with whatever needed to be done at the time. Petitioner had received some training which aided *158 him in the performance of his duties at the clinic. He had previously taken supplemental classes from Diablo Valley College and the United States Public Health Service Center for Disease Control, as well as attending other seminars related to sexually transmitted diseases. Work at the clinic itself also served to provide on-the-job training. During the years in issue, petitioner preferred to work the "graveyard shift" (12 midnight to 8:00 a.m.) on his job as a dispatcher with the City of Oakland Fire Department, keeping his days free to perform his work with the Lambdoidal Church. In addition to any counselling services he provided, petitioner testified that he spent approximately one and one-half to two hours each day in Bible study and prayer. He also testified that he spent some time preparing any ceremonies he was going to perform, as well as keeping up with current medical developments involving sexually transmitted diseases. The Court believes that petitioner spent some time in study, prayer, and preparation, but the Court does not believe that petitioner devoted as much time to these activities as he testified. Petitioner does not charge or accept a fee for any of his activities *159 or services for the Lambdoidal Church, nor does he receive any compensation for his volunteer work at the clinic. Petitioner receives no salary from the church. All such services performed by petitioner are free. Petitioner testified that it is against his "religious" beliefs and the doctrine of the church to accept any payment whatsoever for performing "religious" services or ceremonies. Petitioner has never sought to obtain tax-exempt status for the Lambdoidal Church pursuant to section 501(c)(3). Nor has petitioner ever incorporated the church as a non-profit corporation under California law. During the years in issue, petitioner deposited the following amounts of his personal funds into the Hibernia Bank church account: Year
Amount
1978
[14] $4,424
1979
$5,075
1980
$4,475
In addition, the receipts and disbursements ledger of the Lambdoidal Church maintained by petitioner shows that the amount of $934, $2,965, and $1,057 were received from various other individuals and deposited in the Hibernia Bank church account in 1978, 1979, and 1980, respectively. Several of these "donees" were, or at one time had been, related to petitioner. For example, *160 receipts of $80 and $1,520 for 1978 and 1979, respectively, came from Dr. Sheila P. Gant, petitioner's ex-wife. [15] The ledger also lists receipts from petitioner's brother, Harold K. Rose, in the amounts of $35, $150, and $30 for 1978, 1979, and 1980, respectively, as well as $75 received in 1980 from Rustyn Rose, petitioner's other son who lived with him only in 1979. The amounts received from other individuals range from a low of $10 to as high as $1,000 in the case of one individual. Some of the amounts received were actually reimbursement for use of utilities allegedly belonging to the church. [16] All deposits to the Hibernia Bank church account, whether from petitioner's personal funds or from amounts received from other individuals, were commingled and used largely to pay the rent and utility bills on the various apartments in which petitioner and his son, Klifford, lived during the years in issue. *161 On his Federal income tax returns (Forms 1040) for taxable years 1978, 1979, and 1980, petitioner claimed charitable contributions deductions in the amounts of $4,424, [17] $5,075, and $4,475, respectively, representing the amount of his personal funds deposited in the church account for each year. By separate statutory notices dated April 22, 1981 and June 18, 1982, respectively, respondent disallowed the deductions claimed each year in toto and also determined that petitioner was liable for the section 6653(a) addition to tax for negligence or intentional disregard of rules and regulations for each year. OPINION Section 170(a) allows as a deduction any charitable contribution that is made during the taxable year. The term "charitable contribution" is defined in section 170(c) as follows: (c) Charitable ContributionDefined.--For purposes of this section, the term "charitable contribution" means a contribution or gift to or for the use of-- * * * (2) A corporation, trust, *162 or community chest, fund, or foundation-- (A) * * * (B) organized and operated exclusively for religious, charitable, scientific, literary, or educational purposes, * * *; (C) no part of the net earnings of which inures to the benefit of any private shareholder or individual; * * * Deductions are a matter of legislative grace, and taxpayers must satisfy the specific requirements of the deductions they claim. Deputy v. du Pont,308 U.S. 488 (1940); New Colonial Ice Co. v. Helvering,292 U.S. 435 (1934). Taxpayers bear the burden of proving their entitlement to the deductions they claim. Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a), Tax Court Rules of Practice and Procedure. These rules apply with equal force to deductions claimed for charitable contributions. Davis v. Commissioner,81 T.C. 806, 815 (1983) (on appeal 9th Cir. June 25, 1984). Petitioner first argues that the Universal Lambdoidal Church is a branch or subpart of the Universal Life Church, Inc., of Modesto (ULC, Inc., of Modesto), and is thereby entitled to the benefits of the specific tax exemption held by ULC, Inc., of Modesto during *163 the years in issue. [18] This argument must fail for, as petitioner's brief recognizes, this Court has previously held that such exemption was not a group exemption, and that a "charter" organization or Chapter such as the Lambdoidal Church involved herein does not come within the specific exemption held by ULC, Inc., of Modesto. Davis v. Commissioner,supra,81 T.C. at 815. [19] Whether labeled as "charters," "congregations," or some other term, the various groups receiving charters from ULC, Inc., of Modesto are separate and distinct from ULC, Inc., of Modesto and are not entitled to the benefit of its tax-exempt status. [20] In the case of the Lambdoidal Church, the charter itself specifically recognizes the separateness of the two groups by the language appearing on the "CHARTER" document that "Neither party to this agreement is the general agent of the other." *164 Petitioner next argues that the Lambdoidal Church itself, viewed as a separate and distinct organization, constitutes an eligible recipient for deductible charitable contributions.For this to be true, petitioner must prove that the Lambdoidal Church meets all of the statutory requirements imposed by section 170(c)(2). Petitioner has failed to carry this burden. We note at the outsetthat petitioner has spent a great deal of time on brief arguing that the Lambdoidal Church was in fact a "church" within the legal meaning of that term (Cf. Chapman v. Commissioner,48 T.C. 358 (1967); American Guidance Foundation v. United States,490 F. Supp. 304 (D.C. Cir. 1980), presumably hoping to convince us that the purpose of any activities carried on by the Lambdoidal Church through petitioner were religious in nature. However, we need not address this issue, nor do we question the sincerity of petitioner's beliefs or the fact that he performed good works in his community. Even assuming that the Lambdoidal Church was legally a "church" and that its purposes were religious in nature, matters on which we express no opinion, there are other factors in this *165 case that preclude it from qualifying as an eligible recipient of deductible charitable contributions under section 170(c)(2). Section 170(c)(2)(B) provides, in part, that an eligible recipient must be "organized . . . exclusively for religious, charitable, scientific, literary or educational purposes . . . ." In this regard, section 1.501(c)(3)-1(b)(4), Income Tax Regs., is instructive, providing that: [a]n organization is not organized exclusively for one or more exempt purposes unless its assets are dedicated to an exempt purpose. An organization's assets will be considered dedicated to an exempt purpose, for example, if, upon dissolution, such assets would, by reason of a provision in the organization's articles or by operation of law, be distributed for one or more exempt purposes, or to the Federal government, or to a State or local government, for a public purpose, or would be distributed by a court to another organization to be used in such manner as in the judgment of the court will best accomplish the general purposes for which the dissolved organization was organized. However, an organization does not meet the organizational test if its articles or the law of the *166 State in which it was created provide that its assets would, upon dissolution, be distributed to its members or shareholders. While this regulation does not specifically relate to section 170, "to the extent a regulation promulgated under Section 501 is designed to effectuate the common Congressional purpose [of both section 170 and section 501], it may afford some general guidance in the proper interpretation of Section 170." Calvin K. of Oakknoll v. Commissioner,69 T.C. 770, 773 (1978), affd. without published opinion 603 F. 2d 211 (2d Cir. 1979), cert. denied 444 U.S. 872 (1979), quoting Morey v. Riddell,205 F. Supp. 918, 920 (S.D. Cal. 1962). Petitioner contends that the charter issued by ULC, Inc., of Modesto, the agreement entered into between petitioner, Card, and Walker, and the resolutions passed by the board at the church's organizational meetings must all be considered as "articles of organization," see sec. 1.501(c)(3)-1(b)(2), Income Tax Regs. Accepting, without deciding, petitioner's contention, it is clear that the Lambdoidal Church still fails to satisfy the organizational test. There simply are no *167 provisions in anyof these documents that serve to irrevocably commit disposition of any assets to a qualifying entity upon dissolution, nor does petitioner contend that the applicable state law would require this result. Specifically, and notwithstanding petitioner's interpretation thereof, we do not think that the Lambdoidal Church's agreement to abide by all corporate laws of the local, state, and Federal governments served to dedicate the assets to an exempt purpose. Nor do we think that any language in the ULC, Inc., of Modesto Handbook, a document petitioner first received approximately three years after the formation of the Lambdoidal Church and to which no reference whatsoever is made in any of the documents creating the church, is sufficient for that purpose. Petitioner has not carried his burden of proving that upon dissolution the assets of the Lambdoidal Church would pass to another qualifying entity under section 170(c). Furthermore, petitioner has failed to convince us that no part of the church's net earnings (in this case the contributions made to the church), inured to his private benefit, or to the benefit of other individuals. Sec. 170(c)(2)(C). During the *168 years in issue, funds from the church account were used to pay all of the rent and utility bills connected with the three different apartments in which petitioner and his son lived, as well as the expenses of moving between such apartments. A new dining room table and chairs were bought for use in the apartment where he and his son lived. In addition, charges for telephone service to numbers apparently not related to the Lambdoidal Church were paid from the church account. Petitioner contends that such expenditures constitute valid church expenses authorized by resolution of the board, and that after such expenses only a nominal amount of net earnings remained which could inure to his benefit. Further, petitioner asserts that any inurement as may exist herein qualifies as a parsonage allowance provided for in section 107, and should have no effect on the deductions in issue. We disagree. Expenditures of the type in question here would normally be considered personal living expenses and we are unpersuaded by petitioner's attempt to characterize them as valid church expenditures. See *169 Davis v. Commissioner,supra,81 T.C. at 818. We think it significant that both petitioner and his minor son lived in the two-bedroom apartment.[21]
Furthermore, it is clear that petitioner has misconstrued the meaning of the term "net earnings" for section 170(c)(2)(C) purposes. It is settled that "net earnings" include more than net profits and may inure to the benefit of a private person other than by distribution of dividends. *170 Canada v. Commissioner,82 T.C. 973, 981 (1984), and cases cited therein. Petitioner's argument that any earnings that inured to his benefit were de minimis in nature is not supported by the facts of record and is inapposite. Section 170(c)(2)(C) expressly provides that "no part" of the net earnings may inure to his benefit. Even if the benefit inuring to the individual is small, it is still impermissible. McGahen v. Commissioner,76 T.C. 468, 482 (1981), affd. without published opinion 720 F. 2d 664 (3d Cir. 1983); Unitary Mission Church v. Commissioner,74 T.C. 507 (1980), affd. without published opinion 647 F. 2d 163 (2d Cir. 1981). Petitioner's argument that the benefits he received herein constituted no more than a parsonage allowance permitted by section 107[22] must also fail. Section 107 expressly requires that such benefits must be received by a minister of the gospel "as part of his compensation." The regulations expound on this requirement, providing that such allowance ". . . must be provided as remuneration for services which are ordinarily the duties of a minister of the gospel." Sec. *171 1.107-1(a), Income Tax Regs. The record is clear that petitioner did not and, according to what petitioner described to be a tenet of the Lambdoidal Church, indeed couldnot charge or accept any fee for his activities or services as a minister of the church. Thus, it is clear that the benefits he received did not constitute a parsonage allowance within the meaning of section 107. Petitioner having failed to demonstrate that the Lambdoidal Church satisfied the "organizational test" and the "private inurement test" of section 170(c)(2), the church was not an eligible recipient for deductible charitable contributions for the years in issue. Accordingly, respondent's disallowance of the deductions claimed by petitioner for alleged contributions [23] thereto must be sustained. *172 Respondent also determined that petitioner was liable for the section 6653(a) addition for negligence or intentional disregard of rules and regulations. Petitioner bears the burden of proof on this issue. Bixby v. Commissioner,58 T.C. 757, 791-792 (1972); Rosano v. Commissioner,46 T.C. 681, 688 (1966). Petitioner struck us as a reasonably intelligent, well-educated individual. We simply do not believe petitioner's claim that he sincerely thought he could deduct as charitable contributions amounts "contributed" to an organization which, in turn, returned those contributions to him by paying all of the rent, utility, and cable TV bills for the two-bedroom apartment where he and his son (or sons) lived. We are satisfied that the negligence addition is fully justified by the facts in this case. To reflect respondent's concession for 1978 and the above holdings, Decision will be entered under Rule 155.
Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue.↩
2. In the statutory notice issued for petitioner's 1978 taxable year, respondent also asserted that petitioner was ineligible to file his return for that year as an unmarried head of household and disallowed the dependency exemption under section 151 claimed with respect to petitioner's son, Klifford Sean Rose. Respondent has now conceded that petitioner is entitled to head of household status and to two exemptions (one personal and one dependency) for each of the years before the Court.↩
3. Petitioner allegedly received literature from ULC, Inc., of Modesto prior to his ordination, but could recall nothing about such literature at trial. ↩
4. Walker did not appear as a witness at trial. Neither petitioner nor Card knew Walker's whereabouts, where he worked, how to contact him, or could recall the last time either of them had seen him.↩
5. Our use of the word "church" to refer to petitioner's organization is for convenience only and is in no way intended to express any conclusion on our part as to whether petitioner's organization does, in fact, constitute a church or religious organization.↩
6. The original resolution, which limited the amount of rent to $300 per month was subsequently amended to remove the limitation. ↩
7. This portion of the resolution was also subsequently amended by defining the term "utilities" to specifically include, but not be limited to, gas and electric services, TV cable, and all telephone services.↩
8. A copy of the April 1983 program listing for Concord TV Cable was introduced into evidence by the parties. The parties stipulated that this program listing for Concord TV Cable is substantially the same as that existing during taxable years 1978, 1979, and 1980, except that the current listing does not include TV Channel 38, a religious station.↩
9. The $50 checks were issued to Card and Walker, respectively, on December 23, 1978. At trial, Card testified that she gave her $50 check back to the church. However, the back of the check indicates that Card endorsed the check and then either cashed it or deposited it in another bank account. The disbursements and receipts journal of the church for the years in issue, maintained by petitioner, indicates that a $50 check was issued to Card on December 23, 1978. A subsequent entry reflects a $30 cash receipt from Card on January 12, 1979. ↩
10. etitioner testified that this expenditure represented moving expenses associated with relocation to California of "donated items" from petitioner's ex-wife, Dr. Sheila P. Gant, who resided in Colorado. Petitioner offered no evidence as to what the donated items consisted of, and we think it likely that these "donated item" actually represented household furniture or effects intended for the personal use of petitioner and/or his son.↩
11. Three examples of the types of pamphlets distributed, entitled "How to Cope with Herpes," "VD Facts for Gay Women & Men," and "Some Questions and Answers about Penicillin Resistant Gonorrhea" were introduced into evidence herein.↩
12. One of these teenagers was called as a witness. He was a friend of petitioner's son and lived in the same apartment building. The young man was being reared by a single parent (his mother) and occasionally talked to petitioner when he needed a father figure to whom he could turn.↩
13. Since no marriage services were performed during the years involved in this case, we do not reach, and we express no opinion as to, the legality of any such marriage services.↩
14. Petitioner originally claimed to have deposited $4,684 in 1978, but has conceded the amount of $260 for lack of substantiation. ↩
15. Dr. Gant also "donated" household furniture or effects of an undisclosed value during 1979. See footnote 10, supra.↩
16. The full amount shown received from Rustyn Rose, petitioner's son, represented reimbursement for unauthorized use of the church's telephone. Petitioner believed that a portion of the amount shown as received from another individual also represented reimbursement for calls made on the church's telephone.↩
17. This figure is adjusted to reflect petitioner's concession as to $260 of the amount originally claimed as a charitable contribution deduction for his 1978 taxable year. See footnote 14.↩
18. See Universal Life Church, Inc. v. United States,372 F. Supp. 770↩ (E.D. Cal. 1974). 19. See also Bradfield v. Commissioner,T.C. Memo. 1984-481; Kent v. Commissioner,T.C. Memo. 1984-451; Hoskinson v. Commissioner,T.C. Memo. 1984-400; Hodges v. Commissioner,T.C. Memo. 1984-385; Johnson v. Commissioner,T.C. Memo. 1984-164; Leslie v. Commissioner,T.C. Memo. 1984-61. See also the cases cited in footnote 9 of Davis v. Commissioner,81 T.C. 806, 815↩, n. 9 (1983). 20. We note that the Internal Revenue Service has recently withdrawn its recognition of the tax-exempt status of the Universal Life Church of Modesto, Inc.↩
21. For the year 1979, petitioner claimed and was allowed two dependency exemptions and stated on his return that both Klifford and Rustyn lived with him that year. We also note that petitioner obtained the benefits of head of household status which requires that the unmarried taxpayer maintain as his home a household which constitutes the principal place of abode of a qualified dependent such as a son. For purposes of head of household status, the taxpayer is considered as maintaining a household "only if over half of the cost of maintaining the household during the taxable year is furnished by such individual." Sec. 2(b)(1)(A)(i)↩.
22. SEC. 107. RENTAL VALUE OF PARSONAGES. In the case of a minister of the gospel, gross income does not include-- (1) the rental value of a home furnished to him as part of his compensation; or (2) the rental allowance paid to him as part of his compensation, to the extent used by him to rent or provide a home.↩
23. In the statutory notices of deficiency issued to petitioner and in his briefs, respondent also challenged the claimed contributions on the ground that petitioner had not parted with dominion over and control of the funds he deposited in the church account, and had therefore made no "contribution or gift" within the meaning of section 170(c). See, e.g., Davis v. Commissioner,supra,81 T.C. at 817↩ and cases cited therein.Due to our resolution of the other issues involved, we need not address this issue. However, we note that respondent's contention has merit, since the facts of record would support a strong inference that petitioner controlled the church's board.